650 P.2d 459

**In the Matter of the APPEAL IN COCHISE COUNTY JUVENILE ACTION NO. 5666–J.**

No. 15808–PR.

Supreme Court of Arizona, In Banc.

July 29, 1982.

Rehearing Denied Sept. 14, 1982.

Robert K. Corbin, Atty. Gen., Phoenix, Jay W. McEwen, Asst. Atty. Gen., Tucson, for appellant.

Greenwood, Ryan, Herbolich & Atonna, Ltd. by James B. Greenwood and Wallace R. Hoggatt, Bisbee, for appellees.

GORDON, Vice Chief Justice:

Petitioner Drew filed this petition asking that we review the decision of the Court of Appeals, Division Two, 133 Ariz. 165, 650 P.2d 467 (1981). The Court of Appeals, reversing the order of the Juvenile Court, held that the seven Drew children should be declared dependent. One of the Drew children had died and Mrs. Drew has stated she would not seek medical care for any of the remaining children in the future. We have jurisdiction pursuant to Ariz.Const. Art. 6, § 5(3) and Ariz.R.Civ.App.P. 23. We vacate the decision of the Court of Appeals and affirm the dismissal of respondent-state's petition for the declaration of dependency.

The issue we must decide is if there was sufficient evidence to warrant state interference with the fundamental right of a parent to the custody and control of his or her child, particularly to "monitor" the health of the child when there is no known medical danger and when providing medical care is contrary to the parent's religious beliefs.

On March 20, 1981, Mrs. Drew took her six-year old son, Therial, to the emergency room of the Copper Queen Community Hospital in Bisbee, Arizona. Therial was pronounced "dead on arrival," and an autopsy revealed that the cause of death was "septicemia and peritonitis secondary to perforation of a strangulated inguinal hernia." This condition occurs when a part of the intestine protrudes out through a defective part of the abdominal wall. The intestine

may and often does slip back into place. If the intestine gets caught, however, the blood supply to the area will be cut off, the tissue will die, and the bowel will become obstructed, eventually causing a rupture. Upon rupture the materials in the digestive tract spill into the abdominal cavity causing infection and possibly leading to cardiac arrest and death.

Because of the circumstances of Therial's death the physician who performed the autopsy contacted the Arizona Department of Economic Security [D. E. S.]. Two D. E. S. caseworkers visited the Drew residence on March 31, 1981 and interviewed Mrs. Drew for twenty minutes. In response to questioning, Mrs. Drew explained that she had faith that miracles would safeguard her children and she would not seek medical help if any of the remaining children became ill. D. E. S. subsequently filed a petition requesting that the seven Drew children be adjudged dependent.

A dependency hearing was held on July 23, 1981. After hearing testimony from two physicians, a superintendent of schools, and the two D. E. S. caseworkers, the court declined to adjudge the children dependent as defined in A.R.S. § 8–201(10).[1] The juvenile court found that "the children are apparently well fed, neatly clothed, * * * attend school with some degree of regularity and they have a home which is clean and well kept." The Court of Appeals reversed the juvenile court and found there was sufficient evidence upon which to declare the seven Drew children dependent.

We must first decide, in light of *Santosky v. Kramer,* —— U.S. ——, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the standard of proof courts must apply in declaring children dependent. In *Santosky* the Supreme Court held that parents' right to the care and

1. " 'Dependent child' means a child who is adjudicated to be:

"(a) In need of proper and effective parental care and control and has no parent or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control.

"(b) Destitute or who is not provided with the necessities of life, or who is not provided with a home, or suitable place of abode, or whose home is unfit for him by reason of abuse, neglect, cruelty or depravity by either of his parents, his guardian, or other person having custody or care. * * * "

custody of their children could only be terminated by a standard of proof more strict than a preponderance of the evidence. Adopting a "clear and convincing" evidence test, the court noted that this "standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns." *Santosky,* —— U.S. at ——, 102 S.Ct. at 1402, 71 L.Ed.2d at 617. Arizona has complied with *Santosky* and instituted the clear and convincing standard. *In re Pima County Juvenile Action No. S–919,* 132 Ariz. 377, 646 P.2d 262, (1982). It is the opinion of this Court, however, that the *Santosky* mandate of the "clear and convincing" standard of proof is limited to parental severance cases and is not applicable in the present case, a dependency petition. "Termination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child." *Santosky,* —— U.S. at ——, 102 S.Ct. at 1392, 71 L.Ed.2d at 603. The *Santosky* Court reasoned that

> "in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants."

*Santosky,* —— U.S. at ——, 102 S.Ct. at 1395, 71 L.Ed.2d at 607.

█ In the instant case the state was not seeking permanent termination of all parental rights. Termination is an irrevocable decision. The permanency of termination dictates that it be resorted to in only the most extreme cases. The determination of dependency, however, is not an irreversible decision. It does not sever all contacts between child and parent, nor does it destroy all rights forever. Using the formula of the Supreme Court, the risk of error and the weighing of the private and public interests convinces us that the preponderance of the evidence standard is the proper standard of proof in dependency proceedings. See Ariz.R.P.Juv.Ct. 17(a)(2).[2] Therefore, we must decide if the state has proved by a preponderance of the evidence that interference with the Drew family was warranted.

The Court of Appeals found dependency because there is "no parent or guardian willing to exercise" care, the Drew children are "not provided with the necessities of life," and the "home is unfit * * * by reason of abuse [or] neglect." [3] The Court of Appeals found that the threatened passive conduct involved here (the possible failure to maintain reasonable care by not providing medical care in the future) constituted present abuse as contemplated by the statutes.

The Court of Appeals failed to note that the Legislature had changed the definition of abuse.[4] The Court of Appeals cited:

> "8–201(2.) 'Abuse' means the infliction of physical or mental injury or the causing of deterioration of a child and shall include failing to maintain reasonable care and treatment or exploiting or overworking a child to such an extent that his health, morals or emotional well-being is endangered."

On April 30, 1981 the Legislature changed the definition of abuse to:

> "8.201(2.) 'Abuse' means the infliction of physical injury, impairment of bodily function or disfigurement or the infliction of serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior and which emotional damage is diagnosed by a medical doctor or psychologist as provided in § 8–223 and shall

---

**2.** *"Burden of Proof*

"(a) The burdens of proof in juvenile proceedings, other than transfer hearings, shall be:

"(1) Beyond a reasonable doubt, as to a delinquency matter involving criminal offenses and incorrigibility; and

"(2) By preponderance of the evidence, as to all other types of actions."

**3.** See Note 1, *supra.*

**4.** The miscitation by the Court of Appeals is understandable. A.R.S. § 8–201 was amended by the Legislature twice within two days.

include inflicting or allowing sexual abuse as provided in § 13–1404, sexual conduct with a minor as provided in § 13–1405, sexual assault as provided in § 13–1406, molestation of a child as provided in § 13–1410, sexual exploitation of a minor as provided in § 13–3552, commercial sexual exploitation of a minor as provided in § 13–3553 or incest as provided in § 13–3608."

■ It is noteworthy that the current definition of abuse lacks the phrase "failing to maintain reasonable care" upon which the Court of Appeals relied in deciding the Drew children were abused children. Under Arizona case law and § 8–201 we find the Drew children are not abused. This oversight of the Court of Appeals, however, does not answer the issue of the case, for a dependent child can also be a child "whose parent is not willing to exercise parental care" or who is "not provided with the necessities of life."

■ It is not disputed that parents owe certain duties to their children. It is incumbent on a parent to provide "necessaries" for a child. The definition of necessaries is not a fixed term. What is necessary for the well-being of a child may be defined differently in different cultures or economic and social groups, and may change with the times.

■ Although we recognize the term "necessary" is flexible, the state may impose a minimum threshold of care a parent must provide any child. In general, a parent must provide a child with a place to live, clothing, an education, attention, and medical care as may be required. By necessity these are fluid terms and may depend on the financial wherewithal of the parents, cultural mores, etc. *See Branham v. State,* 33 Ariz. 170, 263 P. 1 (1928).

Accordingly, when we discuss the rights of the parent, the state, and the child, we must weigh and balance the interests of each. Hard and fast judicial rules are sometimes desirable because they increase predictability. But an inelastic rule would not further justice when, as here, we are concerned with a right so important and sensitive as that of parenting a child. Not only must these rights be balanced, but it must also be recognized that a great deal of discretion is vested in the trial court and in the administrative body, here the D. E. S., which feeds information to the court. Just as "what is necessary" is not a rigid definition, neither is the definition of "neglect," *see In re Pima County Juvenile Action No. J–31853,* 18 Ariz.App. 219, 501 P.2d 395 (1972), nor of "abuse."

The United States Supreme Court has consistently declared the significance of the family unit in American society.[5] The right to raise one's family is essential, *see Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1925), and the right to procreate is one of the "basic rights" of all persons. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

> "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

*Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944).

The Supreme Court has adopted the concept of family privacy acknowledging that there are certain aspects of our lives into which the government cannot intrude. *See Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (government cannot intrude on choices concerning family living arrangements); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (state law proscribing abortion infringes on an individual's right of personal privacy); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (state law presuming unmarried fathers unsuitable parents violated the natural father's interest in his children); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)

---

5. This Court recognizes that the word "family" is also a fluid term. In light of the increasing number of divorces and remarriages the definition of "family" is changing.

(state law proscribing the use of contraceptives unconstitutionally intrudes upon a person's right to marital privacy). The Court recently reaffirmed the parents' fundamental liberty interest "in the care, custody, and management of their child." *Santosky,* —— U.S. at ——, 102 S.Ct. at 1394, 71 L.Ed.2d at 606.

■ We have stated that "[b]ecause the child has attained a favored beneficient status in our social and legal systems does not detract from the well-settled rule that the right of parents to the custody of minor children is both a natural and legal right." *Arizona State Dept. of Public Welfare v. Barlow,* 80 Ariz. 249, 252, 296 P.2d 298, 300 (1956). *See also In re Winn,* 48 Ariz. 529, 63 P.2d 198 (1936); *Harper v. Tipple,* 21 Ariz. 41, 184 P. 1005 (1919). Arizona recognizes that the right to control and custody of one's children is fundamental. *In re Pima County Juvenile Action No. S–111,* 25 Ariz. App. 380, 543 P.2d 809 (1975).

■ The rights of parents to the custody of their children, however, is not absolute. *Barlow, supra.* The state has an interest in the welfare and health of children. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). If the interest of the state is great enough—that is, if the welfare of the child is seriously jeopardized— the state may act and invade the rights of the parent and the family. Of no little concern in this balancing process are the rights of the child. The bundle of rights a child may have does not lend itself to a comprehensive list. But the child is entitled to have his or her basic needs cared for. If the parent fails to furnish these needs, the state may and should act on behalf of the child. In a case involving the custody of children, our paramount interest is always the best interest of the child. *In re Marriage of Gove,* 117 Ariz. 324, 572 P.2d 458 (App.1977).

■ The Court of Appeals read our juvenile statutes as demanding that "every child

in Arizona is entitled to a home where the parent or guardian is willing to seek medical attention for him [or her] *should he [or she] become sick or injured."* 133 Ariz. at 166, 650 P.2d at 468 (emphasis added). We agree with this reading of our statutes. At this juncture we depart from the analysis of the appellate court because the Drew children are not known to be sick or injured, and, therefore, there is no known need of medical attention. The evidence from the dependency hearing indicates that after Therial's death, two D.E.S. caseworkers went to the Drew home. The caseworkers identified themselves and Mrs. Drew invited them into her home. They discussed Therial's death and Mrs. Drew explained to the caseworkers that the other seven children were in good health. During the twenty-minute interview the caseworkers observed several well-dressed and well-fed children, presumably the Drew children, dash in and out of the house apparently at play. The caseworkers did not interview or ask to speak with any of the children. In fact, the caseworkers did not even know the names of the Drew children. The names had to be obtained from the superintendent of schools, who testified that the children have good attendance records. It is on the basis of this twenty-minute interview [6] that D.E.S. now seeks to declare these children abused, neglected, and dependent on the state. We cannot and will not say that a woman's statement that she will not seek future medical care for her children who appear physically fit is not exercising parental care.

We emphasize that this would be a different case were any of these children known to be ill. A known illness would cause us to agree with the Court of Appeals that passive conduct, the failure to procure medical attention, may amount to unwillingness to exercise parental care.

We do not pass upon the question whether Therial was neglected or abused [7] as it is

---

6. We do not think a twenty-minute interview would satisfy A.R.S. § 8–546.01(C)(3)(b) which requires "a prompt and *thorough* investigation." (Emphasis added.)

7. It is not part of the record before this Court if criminal charges have been brought against Mr. or Mrs. Drew because of Therial's death.

not he but the seven other Drew children who are the subject of this appeal. This Court takes notice that there may be a psychology of abuse, that is to say, a parent who abuses one child is likely to abuse a second child. The Court of Appeals held that the failure to acquire medical attention for Therial endangered the other Drew children. Among the cases cited by the court are: *In re Maria Anthony,* 81 Misc.2d 342, 366 N.Y.S.2d 333 (1975) (the mother was diagnosed as a schizophrenic catatonic type who did not have the capacity to care for the child); *In re Baby Boy Santos,* 71 Misc.2d 789, 336 N.Y.S.2d 817 (1972) (older child had been beaten and hospitalized; parents were not cooperative, and the court determined it could not expose a newborn child to "imminent risk"); *In re Miller,* 40 Wash.2d 319, 242 P.2d 1016 (1952) (court found that the father was a brutal and sadistic person, not capable of rearing any child). These cases are distinguishable. The circumstances of this case require that a distinction be made between active and passive abuse. We do not have a disorganized home where children are dirty or ill-clothed. See *In re Appeal in Pima County, Adoption of B–6355 and H–533,* 118 Ariz. 127, 575 P.2d 326 (App.1977) *vacated,* 118 Ariz. 111, 575 P.2d 310, *cert. denied,* 439 U.S. 848, 99 S.Ct. 149, 58 L.Ed.2d 150 (1978). Nor is this a home where children are being beaten.

This Court was not provided with statistics on the frequency of strangulated hernias among children. The state's expert testified that he has seen only six deaths from this malady in over thirty years, and these were not limited to children. The cases cited by the Court of Appeals are distinguishable as these cases and other cases uncovered by our research involve instances where the state interfered in the parent-child relationship because of a *present need* of medical attention. *In re Karwath,* 199 N.W.2d 147 (Iowa 1972) (child's health en-

dangered if tonsils not removed); *Custody of a Minor,* 375 Mass. 733, 379 N.E.2d 1053 (1978) (child had leukemia and was in need of chemotherapy); *State v. Perricone,* 37 N.J. 463, 181 A.2d 751 (child suffered from chronic oxygen lack), *cert. denied,* 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); *In re Sampson,* 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972) (child had psychological impairment, although not life threatening); *In re Ray,* 95 Misc.2d 1026, 408 N.Y.S.2d 737 (1978) (child diagnosed as requiring psychiatric treatment); *In re Rotkowitz,* 175 Misc. 948, 25 N.Y.S.2d 624 (1941) (child suffering from an emotional disturbance); *Mitchell v. Davis,* 205 S.W.2d 812 (Tex.Civ.App.1947) (child seriously ill and life was endangered); *In re Welfare of Price,* 13 Wash.App. 437, 535 P.2d 475 (1975) (children diagnosed as having tuberculosis and malnourishment and generally not cared for). These cases are a far cry from the one before us where the state seeks to take legal custody of presumably healthy children from their parents because if the children become ill sometime in the future, medical attention will not be provided.

We further do not understand the emphasis that D.E.S. and the Court of Appeals place on the state requesting only legal custody and not physical custody of the Drew children. As we understand the meaning of legal custody,[8] the state could come into the home at any time, monitor any and all activities of the children, veto any actions of the natural parent, prescribe behaviors, food, clothing, and administer discipline, etc. Legal custody would give the state all the rights of parenthood and virtually make the natural parents' home a foster home from which the children could be removed if cause were found by the caseworker.[9]

■ We turn now to the element of religious freedom in the instant case. Dur-

**8.** See A.R.S. § 8–531(8). Although this definition appears under the article entitled "Termination of Parent-Child Relationship" it offers us guidance on what the Legislature intended legal custody to encompass.

**9.** We do not frown on the arrangement of leaving physical custody with the parents where state intrusion into the privacy of a family is warranted.

ing the single interview of Mrs. Drew,[10] she stated that she believed in miracles and that God's will should be done. She said that if any of the other Drew children got sick she would not take them to a doctor. It is Mrs. Drew's religious beliefs that would prevent her from procuring medical attention for the children. The first amendment to the United States Constitution and Ariz.Const. Art. 20[11] guarantee religious freedom. Perfect religious toleration is qualified by Ariz.Const. Art. 2, § 12.[12] Beliefs are absolutely protected, *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), whereas practices are not absolutely protected.

> "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children * * *."

*Prince v. Massachusetts,* 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645, 654 (1944).

But as *Prince* indicates, when discussing religious freedoms and the state's interest in providing for the welfare of children, the "accommodation between these freedoms [of religion] and an exercise of state authority always is delicate." 321 U.S. at 165, 64 S.Ct. at 441, 88 L.Ed. at 652. The *Prince* court concluded that its ruling did not extend beyond the facts of the case. If there is a direct collision of a child's right to good health and a parent's religious beliefs, the parent's rights must give way. *See In re Sampson, supra.* All the evidence indicates that the Drew children are in good health. There is not a direct collision of rights and, therefore, no need to supersede the religious practices of the Drew family.

D.E.S. concedes that it should not and does not consider religion in instituting dependency proceedings. In the instant case D.E.S. is seeking to have only the Drew children declared dependent. Yet the D.E.S. caseworker admitted not knowing if the state intends to request dependency status for all the children who live in Miracle Valley. Indeed, the initial plan[13] refers to all the "members of the group [who] have signed forms with the school stating that medical treatment would not be permitted" for their children.

In balancing the interests of religious freedom, *see Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), we will not interfere with a parent's fundamental right to the custody of his or her child if providing medical care is contrary to the parent's religious beliefs and there is no known medical danger. It is noteworthy that our Legislature has expressly provided that the failure of Christian Scientists to follow traditional medical procedures is not to be interpreted as abuse.[14] We cannot imagine that the Legislature would give preferential treatment to one religion over

---

**10.** This Court is not ignoring Mr. Drew. Apparently on the only visit to the Drew residence Mr. Drew was not home.

**11.** *"First. Toleration of religious sentiment*
"First. Perfect toleration of religious sentiment shall be secured to every inhabitant of this State, and no inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship, or lack of the same."

**12.** *"§ 12. Liberty of conscience; appropriations for religious purposes prohibited; religious freedom*
"Section 12. The liberty of conscience secured by the provisions of this Constitution shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the State. No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any

religious establishment. No religious qualification shall be required for any public office or employment, nor shall any person be incompetent as a witness or juror in consequence of his opinion on matters of religion, nor be questioned touching his religious belief in any court of justice to affect the weight of his testimony."

**13.** After investigating a case D.E.S. prepares an "initial plan" which states the reason for their services to a family, the family's background, the plan to provide services to the family, and recommendations.

**14.** A.R.S. § 8–201.01: *"Prohibition*
"Notwithstanding any other provision of this chapter, no child who in good faith is being furnished christian science treatment by a duly accredited practitioner shall, for that reason alone, be considered to be an abused, neglected or dependent child."

another because one is perhaps more established and thus more acceptable than another. Again we emphasize that if we were faced with an actual illness of one of the Drew children, the scales would have tipped and religious freedoms would be forced to yield. Because of the delicate nature of these cases, we add that other factors may weigh in favor of the state in inducing us to declare these children dependent. Had there been a genetic predisposition to an illness or the strong suggestion that other children would fall ill, *In re Heinemann's Appeal,* 96 Pa. 112, 42 Am.Rep. 532 (1880), the state may have won the day. Each case must by necessity be decided on its own facts. *In re Karwath,* 199 N.W.2d 147 (Iowa 1972).

The Pennsylvania Supreme Court has addressed the issue of state procurement of medical attention over parental religious objections. A child who suffered from curvature of the spine lived with his mother. The child was unable to stand or ambulate and could become totally bedridden as time passed. The child's mother was a Jehovah Witness and would not consent to the child undergoing a corrective operation. The Pennsylvania court found that although the operation was not necessary to save the child's life, it would have been beneficial and held:

> "that as between a parent and the state, the state does not have an interest of sufficient magnitude outweighing a parent's religious beliefs when the child's life is *not immediately imperiled* by his physical condition."

*In re Green,* 448 Pa. 338, 348, 292 A.2d 387, 392 (1972) (emphasis in original). We cannot say that if we were presented with these facts we would deny dependency. The facts in *Green* are certainly more compelling than those before us and illustrate the reluctance of courts to permit state intrusion. We further note the *Green* case calls into question the vitality of *In re Heinemann's Appeal,* 96 Pa. 112, 42 Am. Rep. 532 (1880), cited by the Court of Appeals.

We emphasize that the state is not without remedy in this matter. D.E.S. has broad supervisory powers. As this case demonstrates, D.E.S. may investigate a family if there is reason to believe a child may be endangered. In this instance, D.E.S. was alerted by Therial's death to a possible problem concerning the welfare of the other children. D.E.S. properly visited the Drew residence to assess the situation and determine whether the other children were fed, clothed, and adequately supervised. D.E.S. retains this supervisory power. It may continue to keep a close eye on the progress of the Drew children. Because of the special circumstances of this case, D.E.S. may be prompted to investigate by something less than would be necessary in a typical situation. An absence from school, a teacher's notification, or a report from a neighbor or other source may permit D.E.S. to inquire further into protecting the welfare of the children. If D.E.S. does compile more information warranting state intrusion into the Drew family, it may again institute dependency proceedings.

We agree with Judge Hathaway's dissent in the Court of Appeals' opinion, 133 Ariz. 169, 650 P.2d 471 (Hathaway, J., dissenting), that the holding of the majority would have been subject to possible misuse.

We find that the evidence is not sufficient for a finding of dependency. We vacate the opinion of the Court of Appeals and affirm the juvenile court's dismissal of the state's petition.

HOLOHAN, C. J., and HAYS, CAMERON and FELDMAN, JJ., concur.