785 P.2d 588

In the Matter of the Appeal in MARI-
COPA COUNTY JUVENILE
ACTION NO. JS–500274.

No. 1 CA–JV 89–003.

Court of Appeals of Arizona,
Division 1, Department D.

Sept. 19, 1989.

Appellee's Petition for Review Granted
in Part and Denied in Part
Jan. 23, 1990.

Laurence B. Stevens and Claudia J. Kro-
man, Phoenix, for appellant.

Taz F. Evans, Mesa, for appellee.

## OPINION

GERBER, Judge.

In this appeal we are called upon to decide whether termination of parental rights may be ordered in the absence of a consideration of the child's best interests.

## FACTS

Guy Imaikalani Goodrich (Guy) and Lori Ann Urchike (Lori) are the natural father and mother of Brent David Kaikala Urchike. The child was born on December 7, 1984, in Mesa, Arizona. He continues to reside in Maricopa County.

The minor child's natural parents first met in November 1983 when Lori was 17 years old and a senior in high school. She was then residing with her parents in Mesa, Arizona. Guy was 19 years old when he first met Lori. He had moved to Tempe, Arizona from his parents' home in Alaska to attend Arizona State University, where he lived in a dormitory on campus. Shortly after they met, they conceived a child in March, 1984. They agreed initially to keep the child. Guy returned from his summer job in Alaska for the 1984 fall semester at Arizona State University. Guy

was present when Brent was born. Guy and Lori agreed that each would pay one-half the medical bills for the birth.

In June 1985, Guy returned to Alaska to work on an oil rig over the summer. In August 1985, at Guy's request, Lori flew to Alaska to meet Guy's parents. While Guy and Lori were in Alaska they became engaged. The couple broke off their relationship in April 1986. For approximately a month thereafter, Guy did not visit his son at the Urchike's residence; however, Lori did bring him to the father's apartment occasionally.

In August 1986, Guy and Lori renewed their relationship. The couple and the child flew to Hawaii in August to visit Guy's grandmother. Upon their return from Hawaii, Guy returned to school and part-time work. During this semester, he saw his son at the Urchike's residence on a regular basis.

In February 1987, Lori broke off the relationship. Lori indicated that the break-up should not affect Guy's relationship with his son and that he could continue to visit his son at the Urchike's residence. Guy next saw him on or about February 22, 1987 when he went to the Urchike's residence to return some of Lori's belongings.

The couple communicated by telephone and correspondence on several occasions over the next seven months, but Guy did not see his son again until the afternoon of August 20, 1987. At that time, Lori brought the child to Guy's apartment. The visit ended with Lori advising Guy that he would never see his son again.

LEGAL PROCEEDINGS

Lori initiated the present petition for termination of parental rights on June 20, 1988. Guy then filed a complaint to establish paternity and parental rights and a response contesting termination.

Upon receipt of the petition for termination of parental rights, the trial court, pursuant to A.R.S. § 8–536, ordered that a social study be performed to make a preliminary recommendation. The trial court appointed caseworker Sue L. McLaughlin (McLaughlin) to perform the study.

On July 19, 1988, McLaughlin initiated her study. She initially contacted Lori by a standard form letter. On July 11, 1988, McLaughlin contacted Guy by form letter. On July 25, 1988, McLaughlin met Lori and her mother at the Urchike home for approximately one hour. On July 27, 1988, two days after the meeting with the Urchikes, and prior to having spoken with or met Guy, McLaughlin submitted her report which attributes the following statement to Lori:

... if Guy were serious about having a relationship with Brent, she would let him see the child.

Report at p. 4.

Despite this statement, the report recommended the termination of Guy's parental rights.

McLaughlin did speak with Guy on July 29, 1988 after she submitted the report; however, it was Guy, not McLaughlin, who initiated the telephone conversation. The record reveals that Guy called from his place of employment. The telephone conversation lasted approximately 15 minutes and consisted of McLaughlin asking two or three questions of Guy.

On August 4, 1988, pursuant to this telephone conversation, McLaughlin filed an addendum to her report reflecting her conversation with Guy. McLaughlin did not contact either party again regarding any alternative to termination. In the addendum, McLaughlin made the following statement:

... When I interviewed Lori Urchike, she told me that if the natural father was serious about having a relationship with the child, and if he would pay child support, she would allow visitation. I did contact both attorneys and told them that I thought there was room for negotiation in this case, and that we possibly could avoid a contested severance hearing.

Despite this statement, McLaughlin again recommended termination of Guy's parental rights.

Lori now seeks to terminate Guy's parental rights so that she can name her parents in her will as guardians for the child in the case of her death and also so that if she marries in the future, her husband would be able to adopt him.

These facts, to the extent they are supported by the record, do not justify a termination of parental rights.

## THE LAW

■ On these facts, a one hour interview with the mother and a 15 minute telephone conversation with the father cannot justify the conclusion that it is in the best interests of the child to terminate the parental relationship. In addition, there is *no* evidence in the record to suggest that Guy's visitation of his son would be detrimental to the child. In *In Matter of Appeal in Maricopa County, Juvenile Action No. JS–6831*, 155 Ariz. 556, 748 P.2d 785 (App.1988), the Court of Appeals held that even if a statutory ground for termination of parental rights exists, such a ground is a necessary but not a sufficient condition to terminate a parental relationship, *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In *No. JS–6831, supra*, the best interests of the children required denial of the termination petition even though the statutory ground of abandonment had been demonstrated. In a word, even when abandonment exists, a further finding regarding the child's best interests is necessary.

■ Neither the report and addendum nor McLaughlin's testimony contain any statement that it would be in the child's best interests to terminate Guy's parental rights. In the absence of such a reason, the trial court's decision to terminate Guy's parental rights was erroneous. When the record is viewed as a whole, it appears that the trial court based its conclusion on the fact that Guy was immature at 19 years of age, put his own needs above his child's needs and failed to assume a true parental role. If these reasons were sufficient to terminate, a great many parent/child relationships could be terminated on a simple petition by one parent. Such evidence does not rise to a level sufficient to terminate parental rights.

■ Lori's unique reasons for seeking termination are not co-extensive with the state's interests in parental rights. Her desires appear based on future possibilities only. Her desires that her parents act as guardians in the event of her death and that a possible future husband adopt the child do not outweigh the natural father's right to maintain a parental role with his child. Her reasons, furthermore, do not meet constitutional requirements for termination. *See In Matter of Appeal in Maricopa County, Juvenile Action No. JS–6831, supra; In Matter of Appeal in Maricopa County, Juvenile Action No. JS–5209 and JS–4963*, 143 Ariz. 178, 692 P.2d 1027 (App.1984). *In Matter of Appeal in Cochise County Juvenile Action No. 5666–J*, 133 Ariz. 157, 650 P.2d 459 (1982), the supreme court in noting that termination is an irrevocable decision held that:

> The permanency of the termination dictates that it be resorted to only in the most extreme cases. *Id.* 650 P.2d at 461.

■ Termination is a severe result because it cuts off forever the right to visit the child. Because of its severity, the state must show the child is jeopardized by the parental relationship. In this case, however, there was neither evidence nor a finding that a continued parent/child relationship would jeopardize the child. In a word, the state has shown no compelling interest in terminating Guy's parental rights.

We therefore reverse the termination order.

GRANT, C.J., and FIDEL, J., concur.