NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MARIA V., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, Z.G., *Appellees*.

No. 1 CA-JV 19-0346
FILED 6-9-2020

Appeal from the Superior Court in Maricopa County
No. JD37500
The Honorable Lindsey G. Coates, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Gillespie, Shields, Goldfarb & Taylor, Phoenix
By DeeAn Gillespie Strub, Kristina Reeves
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which
Presiding Judge Lawrence F. Winthrop and Judge David B. Gass joined.

**C R U Z**, Judge:

¶1 Maria V. ("Mother") appeals the superior court's order adjudicating her child, Z.G., dependent based on Mother's failure to provide proper and effective parental care and control because of domestic violence and her failure to provide a safe and stable home environment with proper supervision. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Mother and Rafael Anthony G. ("Father") are the parents to Z.G., born in October 2016. Mother also has two older children from a prior relationship, although she no longer has custody of them.

¶3 Mother and Father began dating in 2013, and in October 2015, Mother bought a house and Father moved in with her. Late one evening in December 2015, Father came home where Mother and her two older children, aged twelve and thirteen at the time, were asleep. Father woke Mother in her bedroom, and Mother smelled he had been drinking alcohol. Mother told Father to leave the home, and Father began to punch Mother in her face and strangle her. Father took Mother's phone so she could not call the police. Mother began to yell for help, waking her two older children. One of the children began to pound on the door and try to open it, but the door was locked. Mother told her children to call the police, but they were afraid and hid in their rooms.

¶4 Mother eventually was able to convince Father to let her go, and she promised not to call the police. Mother was able to leave the bedroom, grab her car keys, and drive to a fast food restaurant. Mother asked the restaurant employees to call the police. Soon after, the police arrested Father at Mother's home, and he was charged with aggravated assault. Mother went to the hospital and a forensic examination revealed that she had sustained significant injuries from Father's assault.

¶5 Mother ended her relationship with Father, but two months later, in February 2016, Father's parents reached out to Mother. Mother agreed to speak with Father, and she saw Father at Father's parents' home. Although the aggravated assault charges against Father were still pending, Mother spent the night with Father, and Z.G. was conceived. Mother began a relationship with Father again, and the two began couples counseling in the summer of 2016. Father also attended individual counseling, and he was prescribed medication for a mood disorder. Z.G. was then born in October 2016, and Father moved back in with Mother part-time, keeping

his parents' home as his primary residence. In April 2017, Father was placed on three years' probation for the 2015 aggravated assault during which he strangled mother.

¶6        Late one evening in May 2019, Mother heard a noise in her home, and she went downstairs to investigate. Z.G. was sleeping in a crib next to her bed at the time. Mother found Father in her home, intoxicated. Mother asked Father to leave, and Father refused. Mother went upstairs to her bedroom to grab her phone to call the police, and Father followed her. Father grabbed Mother's phone and again attacked her and strangled her while Z.G. was asleep in the room. Mother managed to push Father off, and she ran down the stairs, but Father grabbed hold of her again. Father slammed Mother against the side of the house and ordered her to go back upstairs. Back in her bedroom, Mother found Z.G.'s electronic tablet. Although she could not make phone calls with the tablet, when connected to the internet, she could send text messages. Mother messaged Father's parents, asking for help. However, it was around three in the morning, and no one responded.

¶7        Mother began to experience chest pains and was fearful that she sustained serious injuries from Father's assault. Mother persuaded Father to take her to the hospital. Father placed Z.G. in the car and drove Mother to the hospital. When they arrived at the hospital, Father refused to let Z.G. stay with Mother. Instead, Father returned Mother's phone to her, and drove back to Mother's home with Z.G. in the car. Although Mother now had her cell phone, and was concerned for Z.G.'s safety, she did not call the police. Instead, Mother sent text messages to Father's mother, who had since woken up. In her text messages to Father's mother, Mother said she did not want any more scenes "in front of [Z.G.]," that Father was threatening to kill himself and her, and that she had told the nurses not to call the police. She also asked her to check on Z.G.

¶8        Mother was examined and treated at the hospital, and a nurse told her the hospital had reported the incident to the police, and the police would contact her. Mother reached out to a friend, Antonio R., asking him to take her home and assist her in making sure Father left her home. When Mother arrived home with Antonio R., she was able to grab Z.G., and go upstairs. Father initially refused to leave Mother's home, but after about fifteen minutes of talking with Antonio R., Father left.

¶9        Police arrived at Mother's home the next day, but Mother told police she was unsure if she wanted to press charges. Mother submitted to a forensic exam, which revealed she had sustained forty-seven injuries to

her neck from Father's strangulation. Despite this second attack and related events, Mother remained in contact with Father and allowed him to visit with Z.G. at Mother's home so long as Mother's sister was present.

¶10 The Department of Child Safety ("DCS") received a report of the incident, and a DCS investigator attempted to contact Mother at her home three days after the assault occurred, but no one answered the door. The investigator returned to Mother's home the following day, but again, there was no answer. The investigator left notices on Mother's door both times, and DCS also sent mother a certified letter about the incident. Several days later, DCS attempted to contact Mother at her home for a third time, but there was still no answer. DCS called Mother and left a voicemail informing her that DCS needed to ensure Z.G. was safe, and if Mother did not respond, DCS would contact the police to conduct a welfare check. Mother finally emailed DCS, telling the investigator that she could meet with Z.G. and Mother's sister at a park near Mother's home, but did not make herself available. The investigator met with Mother's sister and Z.G. in the park, and the investigator was able to verify Z.G. was fine, but Mother's sister would not discuss how Mother was doing.

¶11 The investigator was concerned because DCS was unable to speak with Mother, observe her condition, or observe the home. The DCS investigator was also unable to contact Father and was concerned he might still be in Mother's home. About two weeks following the assault, DCS removed Z.G. from Mother's custody. The day after Z.G. was removed, Mother obtained an order of protection against Father.

¶12 In June 2019, DCS filed a dependency petition, alleging Mother was the victim of domestic violence by Father and she had not taken steps to ensure Z.G.'s safety from Father. DCS also found Z.G. dependent to Father due to domestic violence, substance abuse, and his neglect to properly treat his mental health.[1] Although Mother had previously stated she did not want to seek full custody or prevent Father from seeing Z.G., two days after the dependency petition was filed, Mother filed an emergency petition for temporary orders for legal decision making, parenting time, and child support. In June 2019, Father was arrested for violating his probation based on the May attack on Mother; however, Father was not charged with a new crime until August 1, 2019.

¶13 DCS recommended Mother participate in supervised visitation, parent-aide services, a psychological evaluation, and individual

---

[1] Father is not a party to this appeal.

counseling. Mother immediately began participating in services, and in July 2019, she completed the psychological evaluation, and began counseling and parent-aide services.

¶14 The dependency hearing was held in September 2019. DCS testified Mother was engaged in services, but Z.G. was still dependent because Mother had not had enough time to gain insight into the harm of her violent relationship and the effect it had on Z.G. Following the hearing, the juvenile court found that, although Father was in custody, Z.G. was dependent as to Mother and Mother was "neglecting to provide proper and effective parental care and control due to domestic violence and failing to provide a safe and stable home environment and proper supervision." Mother filed a timely notice of appeal.

¶15 Prior to disposition of this appeal, DCS moved to dismiss the dependency. In March 2020, the juvenile court dismissed the dependency and found Mother had "remediated the issue that caused the dependency to be filed," and she "demonstrated that she is able to properly and effectively exercise parental care and control" of Z.G.

¶16 This court has jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-235, 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

¶17 "On review of an adjudication of dependency, we view the evidence in the light most favorable to sustaining the juvenile court's findings." *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005). We review a dependency order for a clear abuse of discretion, and we generally will not disturb a dependency adjudication unless it is clearly erroneous and no reasonable evidence supports it. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015).

I.    Mootness

¶18 As noted above, the dependency matter has since been dismissed. Although Mother did not discuss the possible mootness of this action, the state has raised the issue and has recognized the dependency finding has led to Mother's placement on a registry. *See* A.R.S. § 8-804. Pursuant to A.R.S. § 8-804(A):

> [t]he department shall maintain a central registry of reports of child abuse and neglect that are substantiated and the outcome of the investigation of these reports made under this

article. A finding made by a court pursuant to § 8-844, subsection C that a child is dependent based on an allegation of abuse or neglect shall be recorded as a substantiated finding of abuse or neglect.

¶19 "[W]e will dismiss an appeal as moot when our action as a reviewing court will have no effect on the parties." *Cardoso v. Soldo*, 230 Ariz. 614, 617, ¶ 5 (App. 2012). If we dismiss the appeal, the record will always reflect that the juvenile court found Z.G. to be dependent as to Mother. Additionally, placement on the central registry might affect Mother in future determinations of, among other things, her fitness to retain custody and legal decision making, her ability to become a foster parent, her fitness to adopt a child, employment opportunities, and certain licensing abilities. *See* A.R.S. § 8-804(B). We find this action is not moot, and we decide the merits of this appeal.

II.     Evidence to Support Finding

¶20 Mother argues there was no reasonable evidence to sustain the juvenile court's finding of dependency. For a child to be found dependent, DCS must prove by a preponderance of the evidence one of the grounds found in A.R.S. § 8-201(15). *Louis C.*, 237 Ariz. at 489, ¶ 21; A.R.S. § 8-844(C). In accordance with A.R.S. § 8-201(15)(a), a dependent child is a child adjudicated to be:

> (i) In need of proper and effective parental care and control and who has no parent or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control.

> . . . .

> (iii) A child whose home is unfit by reason of abuse, neglect, cruelty or depravity by a parent, a guardian or any other person having custody or care of the child.

¶21 The juvenile court found Mother "neglect[ed] to provide proper and effective parental care and control due to domestic violence" and Mother "fail[ed] to provide a safe and stable home environment and proper supervision." Mother argues that because Father was incarcerated at the time of the dependency hearing, the domestic violence was not ongoing and so there was no imminent risk to Z.G., and his welfare was not "seriously jeopardized." Mother contends DCS' evidence was no more than the mere possibility that the charges against Father could be dropped

or Father could be released from prison, and that Mother would renew her relationship with Father, and therefore, was insufficient to support the court's dependency adjudication.

¶22        However, "the juvenile court must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child is a dependent child." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48, ¶ 1 (App 2016).  At the time of the dependency hearing, it is true that Father was in custody, and so there was no domestic violence that was actively occurring at that time.  However, "domestic violence need not be continuous or actively occurring at the time of the adjudication hearing to support a finding of dependency on these grounds; the substantiated and unresolved threat is sufficient."  *Id.* at 51, ¶ 16.  Father had not yet been convicted or sentenced for his assault against Mother at the time of the dependency adjudication.  Mother alleged that Father would soon be accepting a plea deal and receive a prison term of no less than two years, but she provided no further evidence of this.  The threat of domestic violence remained unresolved, and it was not unreasonable for the juvenile court to consider whether "Father's release conditions could change or whether he would be able to obtain release from custody before any trial that may be set."

¶23        The juvenile court also had reason to be concerned with Mother renewing her relationship with Father.  Following the 2015 assault, and after only a two-month break in the relationship, Mother went to Father's home and rekindled her relationship with Father.  After the May 2019 domestic violence incident, Mother initially did not wish to press charges against Father, nor did she initially seek an order of protection, because she "didn't feel there was a need," even though Father was sending life-threatening text messages to her.  Mother refused to interact or cooperate with DCS, and she refused to take protective actions until two weeks after the May 2019 incident, and only after DCS removed Z.G. from her custody.

¶24        The record further demonstrates Mother has not been entirely forthcoming and honest about her relationship with Father, and as the juvenile court noted, Mother refused to even acknowledge that she was involved in a domestic violence relationship at the beginning of the case.  Although Mother contends there were only two instances of domestic violence throughout her relationship with Father, DCS reports one of Mother's two older children spoke of ongoing domestic violence in the home.  Mother testified that leading up to the May 2019 assault, Father had no longer been taking his mood stabilizing medication and that he had been

drinking, which she recognized contributed to the domestic violence problem, but she took no steps to have him removed from her home. Mother also testified she had wanted to end her relationship with Father for about a year, but she feared he would retaliate against her. Given Mother and Father's history, as well as Mother's denial of the existence of a domestic violence relationship, there was reasonable evidence to support the juvenile court's finding that Mother had neglected to provide proper and effective parental care and control when she allowed Z.G. to continue to be exposed to episodes of domestic violence. There was also reasonable evidence to support the court's finding that Mother failed to provide a safe and stable home environment and that she could place herself and Z.G. in harm once DCS was no longer involved.

¶25 Mother cites *Aaron W. v. Department of Child Safety*, 1 CA-JV 19-0039, 2019 WL 4695887 (Ariz. App. Sept. 26, 2019) (mem. decision) to support her arguments. In *Aaron W.*, the juvenile court found the children were dependent as to the father, because he failed to protect the children from the domestic violence and substance abuse the children were exposed to by their mother. *Id.* at *1, ¶ 1. This court reversed, ruling the mother had recently been sentenced to a ten-year prison term and any risk the father would continue to fail to protect the children from the mother's bad behaviors was too "speculative and attenuated." *Id.* at *8, ¶ 38. The facts in *Aaron W.* do not parallel the facts of this case, as Mother suggests. In *Aaron W.*, the mother had been sentenced to ten years in prison, whereas here, at the time of the dependency hearing, Father had not yet been convicted or sentenced.

¶26 Additionally, DCS made it clear that even if Father was incarcerated for a significant period of time, that would not eliminate the need for a dependency finding. Even though Father has punched her in the face, slammed her against the wall, and strangled her, Mother was in denial about her involvement in a domestic violence relationship for four years. The juvenile court found that Mother needed the assistance of DCS services to "gain[] insight into how her unhealthy domestic violence relationship negatively affects the child," and if she failed to do so, "she may again engage in an unhealthy relationship with Father or a different significant other." DCS was also concerned about Z.G.'s behaviors and noted that on several occasions the child would hit Mother, potentially mimicking violent behaviors he had witnessed in the home.

¶27 The juvenile court has "a great deal of discretion" in determining whether a child is dependent. *Ariz. Dep't of Econ. Sec. v. Superior Court*, 178 Ariz. 236, 239 (App. 1994) (citation and internal

quotation marks omitted). Although Mother challenges the court's resolution of disputed facts, we will not reweigh that evidence on review. *See Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, 336, ¶¶ 4, 14 (App. 2004) (stating that the juvenile court, as the trier of fact, is in the "best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts"). We conclude reasonable evidence supported the superior court's determination of dependency.

III.     Due Process

**¶28**          Mother argues that the juvenile court violated her due process rights under the federal and Arizona constitutions. "[A] parent indeed does have a fundamental interest in the care, custody and control of her child . . . ." *Mara M. v. Ariz. Dep't of Econ. Sec.*, 201 Ariz. 503, 507, ¶ 24 (App. 2002). However, it is also well-established that the rights of parents to the custody of their children is not absolute. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 161 (1982). The state has a compelling interest in the health and welfare of children, "and, because of the importance of this interest, the state may intrude into the parent-child relationship to protect the welfare of the child and the state's own interest in the welfare of its citizens." *Maricopa Cty. Juv. Action No. JD-561*, 131 Ariz. 25, 27-28 (1981); *see also Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 239, ¶ 12 (App. 2012).

**¶29**          Mother's fundamental right to parent affords her certain procedural due process rights. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Mother argues the juvenile court "refused to adhere to the procedural protections of Mother's due process rights" by failing to satisfy the statutory burdens in the Parents' Bill of Rights, A.R.S. § 1-601.

**¶30**          Section 1-601(A) provides: "The liberty of parents to direct the upbringing, education, health care and mental health of their children is a fundamental right." The statute further provides the state may "not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." A.R.S. § 1-601(B).

**¶31**          Mother claims DCS was required to make express findings of a compelling government interest before interfering with her parental rights, and it was also required to demonstrate that its interference was

narrowly tailored and not otherwise served by less restrictive means. Mother failed to raise this argument below.[2]  Regardless, Mother's argument fails on its merits.  Section 1-601 acknowledges the long-established principle that parental rights are fundamental rights.  *Baker v. Meyer*, 237 Ariz. 112, 114, ¶ 6 (App. 2015).  Mother has provided no legal authority to support her claim that this statute places additional requirements on DCS and the juvenile court in a dependency hearing.

¶**32**      The government may interfere with a parent's fundamental right if the court finds that: "(1) the parent is unable to parent the child for any reason defined by statute; and (2) the parent has been afforded due process."  *Carolina H. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 569, 571, ¶ 6 (App. 2013).  Here, the juvenile court found Mother was unable to parent her child pursuant to A.R.S. § 8-201(15).  The record indicates Mother had a meaningful opportunity to be heard and participate at every stage of the dependency hearings.  Mother's due process rights were not violated, the juvenile court properly applied the relevant law, and nothing further was required of the court.  We find no error.

## CONCLUSION

¶**33**      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA

---

[2]      Mother did raise due process arguments in her Motion for Summary Judgment, but as Mother recognizes, she dismissed her Motion before the juvenile court addressed her arguments.  *See Englert v. Carondelet Health Network*, 199 Ariz. 21, 26, ¶ 13 (App. 2000) ("[W]e generally do not consider issues, even constitutional issues, raised for the first time on appeal.").