NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JOSHUA W., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, E.W., *Appellees*.

No. 1 CA-JV 21-0108
FILED 11-18-2021

Appeal from the Superior Court in Maricopa County
No. JD36906, JS19894
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

COUNSEL

John L. Popilek PC, Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Chief Judge Kent E. Cattani joined.

---

**T H U M M A,** Judge:

¶1　　　　Joshua W. (Father) appeals the superior court's order terminating his parental rights to his son E.W. Because Father has shown no error, the order is affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2　　　　Father and Andrea F. (Mother) are the parents of E.W., born in January 2017, and J.W., born in December 2018. At a doctor's appointment when E.W. was one year old, Mother reported that he had been unable to put any weight on his right leg for the past week. X-rays revealed a fractured femur. The fracture was a spiral fracture, indicating it had been caused by twisting. The fracture also was healing, suggesting that it had occurred 10 days or more before being diagnosed.

¶3　　　　At the pediatrician's urging, Mother took E.W. to the emergency room. Medical personnel concluded that the injury, which the parents could not explain, appeared highly suspicious for nonaccidental trauma. But no one notified law enforcement or the Department of Child Safety (DCS).

¶4　　　　Later that year, Mother gave birth to J.W. He was healthy, though Mother later described him as colicky, or fussy with bouts of continual crying. One day when J.W. was two weeks' old, Mother and Father were alone with both children until about 2:00 p.m. Mother then went to the grocery store. Before leaving, Mother handed J.W., who was crying, to Father and asked him to burp the infant. When she returned 15 minutes later, Mother found Father holding J.W. The infant was "unresponsive and limp," his head was tilted back, and he was gasping for air. The parents did not immediately call 9-1-1 or take J.W. to an emergency room. Instead, Father searched the internet for J.W.'s symptoms; the results suggested the parents needed to seek immediate medical attention. About 20 minutes later, Mother drove J.W. to the nearest urgent care.

¶5        From urgent care, J.W. was transferred to Phoenix Children's Hospital where he died 10 days later. J.W. had sustained significant brain injury, including a skull fracture and swelling from extensive bleeding, retinal hemorrhages, and like his brother before him, a fractured femur. Doctors concluded J.W.'s injuries were "highly associated with child abuse" and that his particular femur fracture was the sort that typically occurs "either with pulling [and] twisting or violent shaking." Doctors found no other potential causes for J.W.'s injuries, ruling out infection, disease, or birth trauma. Other medical providers testified that J.W.'s skull fracture and injuries required "some sort of force applied to the head and to an object." and were consistent with abusive head trauma.

¶6        An autopsy confirmed J.W.'s diagnosed injuries, and found additional injuries to his neck, spine, and tibia. The medical examiner concluded that J.W. died from complications of impact of his head with a hard surface, and that the manner of death was homicide. When Mother and Father offered hospital staff no plausible explanation for J.W.'s injuries, DCS took immediate custody of E.W. and filed a dependency petition.

¶7        The Avondale Police Department began a criminal investigation. Mother told investigators she and Father were J.W.'s sole caretakers since his birth and when she asked Father what had happened to J.W., he stated, "I don't know. He was crying then he just suddenly stopped and . . . appear[ed] unresponsive." Father, in turn, told investigators that J.W. had been "constantly crying" since his birth and that after Mother left for the store that day, Father "tried everything to console" J.W., but "nothing seemed to make him stop crying." Father told investigators he was patting J.W. on his back when he noticed the infant suddenly stop crying and lose consciousness. The parents each told investigators that J.W. had suffered no falls or accidents that would explain his injuries. When police interviewed Mother again a few days later, however, she told them that after her first interview, Father admitted he had become "really frustrated" and "bounc[ed]" J.W. repeatedly on his knee until he "went unresponsive."

¶8            DCS moved to terminate the parents' rights to E.W. based on abuse and neglect. *See* Ariz. Rev. Stat. (A.R.S.) § 8-533(2) (2021).[1] The superior court held a combined dependency and termination adjudication over six days in November and December 2019. The court later issued an order terminating the parents' rights to E.W.

¶9            In a previous appeal, this court noted the record contained substantial evidence showing neglect and abuse of J.W., but concluded that the superior court had not made sufficient findings of fact and conclusions of law. This court therefore reversed and remanded the case for clarification. *See Andrea F. & Joshua W. v. Dep't of Child Safety*, 2021 WL 162020 ¶¶ 27, 30 (Ariz. App. Jan. 19, 2021) (mem. dec.). In March 2021, the superior court issued a supplemental order confirming the termination of both parents' rights. This court has jurisdiction over Father's timely appeal pursuant to Article 6, Section, 9, of the Arizona Constitution, A.R.S. § 8-235(A), 12-120.21(A) and 12-2101(A) and Ariz. R.P. Juv. Ct. 103-104.

## DISCUSSION

¶10           As applicable here, to terminate parental rights, a court must find by clear and convincing evidence that at least one statutory ground in A.R.S. § 8–533(B) has been proven and must find by a preponderance of the evidence that termination is in the best interests of the child. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 12 (2000). Because the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," this Court will affirm an order terminating parental rights as long as it is supported by reasonable evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009) (citation omitted).

¶11           The court may terminate the rights of a parent who "has willfully abused a child." A.R.S. § 8-533(B)(2). Abuse is defined as "the infliction or allowing of physical injury, impairment of bodily function or disfigurement." A.R.S. § 8-201(2). In terminating a parent's rights under § 8-533(B)(2) to a child who himself has not been neglected or abused, "the juvenile court must find during the parental unfitness inquiry, by clear and convincing evidence, that there is a risk of harm to" that child. *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 228 ¶ 17 (2020). A risk of harm can exist where the prior abuse is recent. *See Linda V. v. Ariz. Dep't of Econ. Sec.*, 211

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated

4

Ariz. 76, 77, 80 n.3 ¶¶ 2-5, 17 (App. 2005). It also may exist where the risk is manifest given the nature of the abused child's injuries and the age and vulnerability of the child at issue. *Sandra R.*, 248 Ariz. at 231 ¶ 31.

**¶12**        The superior court found that DCS proved, by clear and convincing evidence, that severance of Father's rights was warranted because of his neglect and abuse of J.W., which put E.W. "at substantial risk of harm." The court found that "the evidence strongly point[s] to Father as the perpetrator of the abuse on [J.W.]," and the court found credible Mother's timeline of events preceding J.W.'s death, meaning she "handed a healthy [J.W.] over to Father's care, ran an errand and returned to find [J.W.] with life-threatening injuries."

**¶13**        On appeal, Father argues that DCS "offered no explanation as to how or why [J.W.] was injured." The law, however, does not require DCS to prove precisely how or why J.W. was injured while in Father's care. The trial evidence amply supports the finding that Father abused the child. The trial evidence also supports the finding that after J.W. became unconscious, Father "failed immediately to summon emergency assistance for a helpless baby in such obvious medical distress by the time Mother returned home or thereafter," from which the court reasonably inferred that Father "hop[ed] to conceal his physical abuse of [J.W.]"

**¶14**        Father next contends insufficient evidence supports the finding that E.W. would be at a substantial risk of harm if he were returned to Father's care.[2] DCS took custody of E.W. right after learning about the injuries to his brother, and evidence regarding E.W. was limited to the unexplained spiral femur fracture treated in early 2018. Father argues that he has a bond with E.W., who is older than J.W. when he died, and "does not have the same weak neck and skull of a newborn." Contrary to Father's arguments, the seriousness of his abuse of J.W. is obvious, and the risk of additional harm to E.W. is not diminished by Father's contention otherwise. Considering these facts, the superior court properly could find the risk of harm to E.W. was "manifest in light of the nature of [J.W.'s] injuries and [E.W.'s] vulnerability." *Sandra R.*, 248 Ariz. at 231 ¶ 31.

---

[2] The termination order erroneously states "Mother," instead of "Father," in this finding. *See In re Marbella P.*, 223 Ariz. 159, 160 n.3 (App. 2009) (construing omission of word "not" from transcript as a typographical error because the court's intention was clear).

¶15　　　　Father argues the court erred in taking judicial notice "that there is a psychology of abuse, meaning that a parent who abuses one child is likely to abuse a second. *Matter of Appeal In Cochise County Juvenile Action No. 5666-J*, 133 Ariz. 157, 162 (1982)." Father also argues the court erred by adopting that theory, which DCS presented in its written closing argument, "as one of its factual grounds for its severance finding." Contrary to Father's assertion, although the court noted that DCS had offered the "psychology of abuse" as support for severance, it did not mention the "psychology of abuse" within (or as the basis of) any of its findings. The numerous factual findings make clear that the court analyzed the specific facts of the case and did not improperly rely on an unsupported theory. *See Callender v. Transpacific Hotel Corp.*, 179 Ariz. 557, 562 ¶ 12 (App. 1993) ("To justify reversal, trial errors must be prejudicial to the substantial rights of the appealing party" and "must affirmatively appear from the record.").

**CONCLUSION**

¶16　　　　The order terminating Father's parental rights to E.W. is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:　AA