NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

PHYLLICIA C., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, M.R., *Appellees*.

No. 1 CA-JV 16-0297
FILED 2-9-2017

Appeal from the Superior Court in Maricopa County
No. JD511089
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

Law Office of David W. Bell, Mesa
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Ashlee N. Hoffmann
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which
Presiding Judge Randall M. Howe and Judge Jon W. Thompson joined.

**W I N T H R O P**, Judge:

¶1        Phyllicia C. ("Mother") appeals the juvenile court's order terminating her parental rights to M.R. ("the child").[1]  Mother argues that the court considered improper factors—specifically, employment and housing—in terminating her rights.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[2]

¶2        Mother is the biological mother of the child, who was born in 2011.  Mother has a long history of mental illness, depression,[3] and substance abuse—including alcohol, marijuana, and spice—that has persistently and negatively affected her ability to parent the child.  While pregnant with the child, Mother moved often, residing in three different homeless shelters.

¶3        In May 2013, the maternal grandmother filed a private dependency petition, alleging that Mother smoked marijuana around the child, solicited marijuana in the child's presence, and neglected the child by not properly feeding, bathing, or nurturing her, leaving her with unrelated persons, and not providing her with proper medical care.  Mother later admitted using marijuana the same month the private dependency petition was filed.

¶4        Shortly after the private dependency petition was filed, Mother engaged in a physical altercation with the maternal grandmother in front of the child and was evicted from the maternal grandmother's home.  Mother and the child moved in with a co-worker—ostensibly, Mother's boyfriend—and his parents; however, approximately three weeks later,

---

[1]        The juvenile court also terminated the parental rights of the child's father ("Father").  Father is not a party to this appeal.

[2]        We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010).

[3]        Mother attempted suicide at age ten, when she tried to hang herself, and admitted she had "lost count" of the number of times she had since attempted suicide.

Mother was evicted from that home and had to move in with someone with whom she had previously lived.

¶5        Meanwhile, on June 10, 2013, the private dependency petition was dismissed after Mother agreed to participate in in-home services provided by the Department of Child Safety ("DCS").[4]   These services included a Family Preservation Team, which was designed to prevent the child's removal from the home.

¶6        Mother did not fully engage in Family Preservation Services, however, and continued to struggle to properly care for the child.[5] Consequently, the Family Preservation Team expressed concerns that Mother was depressed, her depression was preventing her from caring for the child, she was inattentive to the child's needs during visits, and she did not understand how her mental health affected the child's quality of life and development.  The Family Preservation Team also expressed a concern that Mother's income was not stable enough to meet the child's needs.[6]

¶7        Mother was referred to Community Bridges for a psychological consultation and individual counseling.  Instead, Mother informed DCS that she would prefer to receive counseling through the

---

[4]        References to DCS in this decision may encompass the Arizona Department of Economic Security ("ADES") and Child Protective Services, a former division of ADES that was replaced by DCS, an entity outside of ADES, in May 2014.  *See* 2014 Ariz. Sess. Laws, ch. 1, §§ 6, 20, 54 (2d Spec. Sess.).

[5]        Although the Family Preservation Team scheduled appointments in advance and at various times of day, upon their arrival they would often find Mother sleeping, and the child was always alone in her crib.  Celice Korsten, Psy.D., who conducted a psychological evaluation of Mother on February 7, 2014, later testified that "it sounded like [the child] was being left in the crib for most of the day while [Mother] was sleeping."  The maternal grandmother also reported that when Mother stayed with her, she would routinely return home to find Mother sleeping and not supervising the child, and in one instance, when she arrived home, she found the child, wholly unsupervised, eating her own feces from her diaper while Mother slept.

[6]        Mother had admitted having been homeless and going without food in order to feed the child.

University of Phoenix, despite the fact that the University of Phoenix had informed Mother, in writing, that its services were insufficient to treat her significant mental health concerns. Consequently, Mother never followed up with Community Bridges for assessment or counseling, and the referral closed out unsuccessfully due to Mother's refusal to participate. Mother continued to fail to fully engage in the services offered by her Family Preservation Team, and the Family Preservation Services eventually closed out unsuccessfully, even after a thirty-day extension, "based on the failure to progress as an in-home dependency."

¶8        In December 2013, DCS filed a dependency petition, alleging that Mother neglected the child and was unable to parent due to mental health issues.[7] The child was placed in the physical custody of the maternal grandmother, with whom she remained throughout the subsequent proceedings. Mother denied the allegations in the dependency petition, but submitted the issue of dependency to the court.

¶9        In February 2014, the juvenile court found the child dependent as to Mother. To assist in the case plan of family reunification, DCS offered Mother case management services, case plan staffing, family counseling, a psychological evaluation, individual counseling, a psychiatric evaluation, substance abuse assessment and treatment, substance abuse testing, supervised visitation, parent-aide services, and transportation.

¶10        Mother completed a psychological evaluation with Dr. Korsten, who diagnosed Mother with bipolar disorder, post-traumatic stress disorder, cannabis-use disorder, trichotillomania,[8] neglect of child, homelessness, partner abuse, and antisocial and borderline personality disorder traits. During the evaluation, Mother appeared depressed, with a "flat affect and tired looking demeanor," and chose to lie on the couch with

---

[7]        In the petition, DCS alleged, "Mother's depression is a barrier to her providing appropriate care for herself and the child," and "Mother lacks understanding how her mental state affects her ability to properly parent." DCS also noted that Mother was "not interacting with the child," and the child was "constantly in her playpen or crib." When the child came into DCS's care, she had recurring ear and other infections, had night tremors that would cause her to "shake quite a bit," and was so severely neglected that she was initially assessed to be developmentally disabled.

[8]        Trichotillomania is an impulse control disorder characterized by "a morbid impulse to pull out one's own hair." Dorland's Illustrated Medical Dictionary 1641 (25th ed. 1974).

her scarf as a blanket. Dr. Korsten opined that Mother "exhibited poor insight and judgment" and "minimized" the issues that had resulted in DCS's involvement. Mother also "had excuses for the reasons she did not follow through with counseling services in the past and minimized how her financial restrictions may interfere with her capacity to care for a child." Further, Mother exhibited "a reckless disregard for herself and others, including her daughter," "did not appear to see the problem with leaving her child unattended for the majority of the day while she slept," and "lacked remorse related to the treatment of her daughter as indicated by reacting indifferently to how [the child] may [have] been affected by her failure to be actively involved in her care and not being emotionally attuned to her needs."

¶11            Dr. Korsten opined that Mother's MMPI-2[9] results "suggested she had a tendency to underreport psychological problems in an attempt to appear better adjusted than she may be in reality." Mother blamed the majority of her problems on the maternal grandmother "and failed to take accountability for her role in the situation." She also exhibited "consistent irresponsibility and appear[ed] to have a disregard for herself as well as her child." Dr. Korsten noted the presence of several "stress factors" that made parenting particularly difficult for Mother and caused the child to be at risk, including Mother's "active symptoms of mental illness," Mother's lack of financial stability and difficulty maintaining long-term employment, Mother's lack of stable housing, and Mother's history of being involved in relationships involving domestic violence. Dr. Korsten opined that, "[g]iven [Mother's] history of poor judgment, it is likely that she will engage in similar behaviors that will interfere with her ability to parent in the future."

¶12            Further, given the numerous ways in which Mother's mental health issues negatively affected her parenting ability, and the problems commonly developed by children exposed to such issues, Dr. Korsten concluded that "[t]here is a poor prognosis that [Mother] will be able to demonstrate minimally adequate parenting until she successfully completes the recommend[ed services]," including substance abuse treatment, individual therapy, psychiatric treatment, and parenting classes, and she "cease future involvement in domestically violent relationships, and maintain stable housing/employment." Dr. Korsten further opined

_____

[9]      The MMPI-2, or Minnesota Multiphasic Personality Inventory-Second Edition, is a commonly administered psychological evaluation test.

that "it is likely [Mother]'s condition will continue for a prolonged period of time."

¶13 Despite Dr. Korsten's recommendations, Mother's participation in reunification services remained lackluster and unreliable. DCS referred Mother for substance abuse testing through TASC and Physician Services, Inc., but she was only minimally compliant. She often missed tests and, over the course of the underlying dependency, tested positive for opiates, amphetamines, and marijuana. In April 2015, she tested positive for marijuana and thereafter was required to test more regularly—but she missed six subsequent drug tests. Between April and June 2015, Mother tested positive for marijuana at least four times. She missed at least fourteen required tests in 2015 and another ten required tests in 2016. In many instances, she failed to call in for testing. Her noncompliance continued late into the dependency. In April and May 2016—only two months before the severance hearing—Mother tested positive for amphetamines six times and opiates once.

¶14 Mother also failed to consistently and meaningfully participate in substance abuse treatment. She was referred to TERROS Families FIRST ("TERROS") in February 2014, but the referral closed due to her lack of participation and because she initially denied abusing illegal substances. When Mother tested positive for marijuana in April 2015, however, DCS again referred her for substance abuse treatment and testing, but her participation was sporadic and "not fully compliant."

¶15 Mother was also referred to Cradles to Crayons for an assessment for child-parent psychotherapy and family-time visit coaching to address appropriate parenting, bonding, and safety skills—as recommended by Dr. Korsten—but the referral closed unsuccessfully because Mother did not attend scheduled appointments or participate in the service. Mother also failed to complete psychological services or counseling, despite referrals to four separate agencies—TERROS, Buwalda Psychological Services ("Buwalda"), Community Bridges, and Jewish Family and Children's Services ("JFCS"). Mother's referrals to Buwalda and Community Bridges closed unsuccessfully due to her lack of participation. Mother missed three intake appointments with JFCS, and even after completing the intake process, her participation was described as "sporadic." In three years of DCS involvement in her case, Mother could never provide DCS with proof of completing or successful discharge from counseling services.

¶16        Mother similarly struggled with maintaining stable employment and independent housing, despite their importance since the beginning of the case. Mother never provided DCS with proof of a stable source of income, and acknowledged at the hearing on the motion for termination that her employment history was unstable. She moved from job to job, admitting "they had to let me go most times," and at the time of the hearing, was still unemployed. Additionally, Mother had lived with multiple persons throughout the three years of DCS involvement and had no control over who else lived with her and the child. When the DCS case manager attempted to complete background checks on the other adults living in the residence to ensure the child's safety, some of the adults refused to provide the necessary information. At the time of the severance hearing, Mother was still dependent on others for housing and had been unable to pay rent for twelve of the previous eighteen months. Mother's complete reliance on others for housing concerned Dr. Korsten, who opined that stress—including stress caused by a lack of housing or unstable employment—could serve as a trigger for Mother's bipolar symptoms.

¶17        Mother also struggled to appropriately participate in visitation with the child, often cancelling or being unprepared for visits, or using the phone during the visit. In April 2015 (when Mother tested positive for marijuana) she appeared lethargic and exhausted, and even appeared to be falling asleep during visitation with the child. Mother also acted child-like around the child, who would at times have to vie for Mother's attention while Mother texted during visits. Mother also admitted having difficulty managing the child's behavior during visits, being overwhelmed, and needing to call the maternal grandmother for help with the child.

¶18        At a June 2, 2015 report and review hearing, the juvenile court ordered the case plan changed to severance and adoption. On June 17, 2015, DCS moved to terminate Mother's parental rights to the child on nine-month and fifteen-month out-of-home placement grounds. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(8)(a), (c) (Supp. 2016).[10] In part, DCS alleged that Mother had been closed out of the Family Preservation Team and Cradles to Crayons unsuccessfully, missed multiple scheduled urinalysis tests through TASC, tested positive for THC, failed to successfully participate in individual counseling, cancelled or was late to multiple visits with the

_____

[10]        We cite the current version of the statute because no changes material to our analysis have occurred since the date of severance.

child, missed three scheduled psychiatric evaluations before completing a fourth intake, and had been inconsistent with services throughout the case.

**¶19** On July 26, 2016, the juvenile court held a contested hearing on the motion for termination. By this time, the child had been in DCS's legal care for approximately thirty-one months.

**¶20** After taking the matter under advisement, the juvenile court issued a detailed nine-page order terminating Mother's parental rights to the child on the nine-month and fifteen-month out-of-home placement grounds. In part, the court found that Mother had substantially neglected—and been unable—to remedy the circumstances that led to the out-of-home placement, and "[t]here is a substantial likelihood that [Mother] will not be capable of exercising proper and effective parental control in the near future." The court noted that Mother "continues to be sporadic in her involvement in services," "has never demonstrated a consistent pattern of sustained sobriety," and "has not followed through on the specific recommendations" made in the psychological evaluation to address her "substantive mental health concerns." The court further noted that Mother "has never maintained consistent employment" and "[h]er current housing is not something she could sustain independently, per her own admission." The court also found that DCS had made diligent efforts to provide reunification services for Mother, and termination was in the child's best interest.

**¶21** Mother filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 8-235(A) (2014) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

### I. Standard of Review

**¶22** A parent possesses a fundamental liberty interest in the care, custody, and management of her child. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11, 995 P.2d 682, 684 (2000)). Even fundamental rights are not absolute, however. *Id.* (citing *Michael J.*, 196 Ariz. at 248, ¶ 12, 995 P.2d at 684). A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and finds by a preponderance of the evidence that severance is in the child's best interest. *See* A.R.S. §§ 8-533(B), -537(B) (2014); *Kent K.*, 210 Ariz. at 281–82, 288, ¶¶ 7, 41, 110 P.3d at 1015–16, 1022.

¶23 The juvenile court retains great discretion in weighing and balancing the interests of the child, parent, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160, 650 P.2d 459, 462 (1982). As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4, 100 P.3d 943, 945 (App. 2004)). Thus, the resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12, 53 P.3d 203, 207 (App. 2002); *see also Pima Cty. Adoption of B-6355*, 118 Ariz. 111, 115, 575 P.2d 310, 314 (1978) ("In considering the evidence it is well settled that an appellate court will not substitute its own opinion for that of the trial court." (citation omitted)).

¶24 We will not disturb the juvenile court's order absent an abuse of discretion or unless no reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7, 225 P.3d at 606; *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004). In reviewing the juvenile court's decision to terminate parental rights, we review *de novo* the court's legal determinations. *See Ariz. Dep't of Econ. Sec. v. Ciana H.*, 191 Ariz. 339, 341-42, 955 P.2d 977, 979-80 (App. 1998).

¶25 For severance to occur under § 8-533(B)(8)(a), evidence must show "[t]he child has been in an out-of-home placement for a cumulative total period of nine months or longer pursuant to court order . . . and the parent has substantially neglected or wilfully refused to remedy the circumstances that cause the child to be in an out-of-home placement." Under subsection (c), evidence must show "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order . . . the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future."

       II. *Mother's Challenge to the Court's Findings*

¶26 In this case, reasonable evidence supports the juvenile court's factual findings, and the court's severance order is supported by clear and convincing evidence under both of the statutory grounds asserted by DCS—the nine-month out-of-home placement ground under A.R.S. § 8-

533(B)(8)(a) and the fifteen-month out-of-home placement ground under A.R.S. § 8-533(B)(8)(c).[11]

¶27        Mother nonetheless argues that the juvenile court erred by considering her inability to independently pay for her housing and her lack of steady employment as factors that supported termination of her parental rights. Mother notes "[i]t was acknowledged that Mother had a friend that regularly paid her bills and housing expenses," and she maintains "[t]here was no evidence to suggest that she would be forced out of that home in the near future." She further maintains her lack of employment should not be held against her because she might be able to qualify for public assistance to help her feed and care for the child.

¶28        However, Mother's extremely unstable employment and dependency on others for housing were concerns from the beginning of the case. Mother admitted going without food to feed the child and moving continuously from job to job. The juvenile court found her explanations for the constant terminations of her employment were implausible, and Mother acknowledged "they had to let me go most times." Although Mother claims the court committed legal error in finding she did not have steady, continuous employment, Mother provides no legal authority for her assertion, and her inability to provide for the child's basic needs, combined with the fact that stress—including stress from unstable employment—could trigger Mother's bipolar symptoms, supports the court's finding on this ground.

¶29        As to the juvenile court's consideration of Mother's inability to independently pay for her housing, we also find no error. Mother admitted being evicted multiple times—at least once after a physical confrontation—and living in a series of residences. At the time of the hearing on the motion for termination, Mother was still dependent on others for housing; in fact, she had been unable to pay her portion of the rent for twelve of the previous eighteen months. Moreover, because she was reliant on others for housing, Mother had no control over who else resided in the home, and DCS was unable to complete background checks on the other adults living in the home to ensure the child's safety because

---

[11]        If clear and convincing evidence supports either statutory ground on which the juvenile court ordered severance, we need not address claims pertaining to the other ground. *Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205 (citations omitted); *see also* A.R.S. § 8-533(B) (requiring that evidence sufficient to justify the termination of the parent-child relationship include "any one" of the enumerated termination grounds).

some of the adults refused to provide DCS with the necessary information. Although Mother suggests the court committed legal error in considering her lack of independent, stable housing, Mother's inability to ensure safe housing for the child—combined with the fact that stress caused by a lack of housing can serve as a trigger for Mother's serious bipolar symptoms—supports the court's findings. Further, despite Mother's suggestion to the contrary, we will not reweigh the evidence in her favor. *See Jesus M.*, 203 Ariz. at 282, ¶ 12, 53 P.3d at 207; *Pima Cty. Adoption of B-6355*, 118 Ariz. at 115, 575 P.2d at 314.

¶30 Although not clearly raised as an issue, Mother also argues "the evidence presented did not reasonably suggest that Mother had any sort of ongoing substance abuse issues that would interfere with her parenting abilities." However, Mother's mental health issues and interrelated substance abuse problems led to the child's dependency and were concerns from the beginning of the case. To reunify Mother with the child, DCS referred Mother for numerous services, including a Family Preservation Team, case management services, case plan staffing, family counseling, a psychological evaluation, individual counseling, a psychiatric evaluation, substance abuse assessment and treatment, substance abuse testing, supervised visitation, parent-aide services, and transportation. Nonetheless, despite approximately three years of services, Mother's substantial mental health and substance abuse issues remained unresolved, largely due to Mother's lack of meaningful participation in those services. Despite Mother's claim to the contrary, her substance abuse testing record constitutes reasonable evidence of her sporadic, aborted attempts to remedy her addiction, and the juvenile court properly considered this evidence, including the fact that, in April and May 2016—only two months before the severance hearing—Mother tested positive for amphetamines numerous times and opiates once. Reasonable evidence also supports the juvenile court's finding that Mother's participation in substance abuse treatment was sporadic and that, even after Mother's participation in some services, she continued to substantially neglect or wilfully refuse to remedy her substance abuse and substantive mental health concerns. Mother's emphasis on excusing her missed tests and nonparticipation in substance abuse treatment is unavailing because the weight and resolution of factual conflicts within the evidence was solely the province of the juvenile court. *See Jordan C.*, 223 Ariz. at 93, ¶ 18, 219 P.3d at 303.

III. *Best Interest*

¶31 Mother does not challenge the juvenile court's finding that severance was in the child's best interest; however, we note that the record

supports the finding. The record demonstrates the affirmative benefits of permanency and stability available to the child from severance, and the court found the child's placement, the maternal grandmother, is currently meeting the child's needs and is willing to adopt the child. *See Maricopa Cty. Juv. Action No. JS–500274*, 167 Ariz. 1, 6–7, 804 P.2d 730, 735–36 (1990); *Oscar O.*, 209 Ariz. at 334, ¶ 6, 100 P.3d at 945; *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998).

## CONCLUSION

**¶32** The juvenile court's order terminating Mother's parental rights to the child is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA