NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

---

JURNEE H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, N.M., *Appellees*.

No. 1 CA-JV 16-0282
FILED 3-28-2017

---

Appeal from the Superior Court in La Paz County
No. S1500JD201500002
The Honorable Samuel E. Vederman, Judge

**AFFIRMED**

---

COUNSEL

Carr Law Office, PLLC, Parker
By Sandra Carr
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which
Presiding Judge Randall M. Howe and Judge Jon W. Thompson joined.

---

**W I N T H R O P**, Judge:

¶1          Jurnee H. ("Mother") appeals the juvenile court's order terminating her parental rights to her biological daughter, N.M. ("the child"), on the statutory ground of abuse or neglect.[1] For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[2]

¶2          At 1:17 p.m. on March 10, 2015, Mother took the child, who was only nine months old, to a hospital emergency room. The child had extensive bruising on her torso, neck, face, arms, legs, ears, and right hand; a fractured right leg; bruising, tears, lacerations, and/or abrasions to her upper and lower lips, mouth, tongue, and throat; and severe bruising to her genitalia, which was swollen and discolored. The attending physician noted the bruising was "in all stages of healing."

¶3          Mother offered several possible explanations for the child's injuries, including that the child (1) had possible bug bites, (2) "is rough and gets into stuff," (3) fell off a bed or chair, and (4) may have been bitten by the family dog, who plays "rough." Hospital staff believed the explanations appeared inconsistent with the child's injuries, however, and contacted the police and the Department of Child Safety ("DCS") due to concerns of child abuse.

¶4          Parker Police Sergeant Mike Bailey arrived at the hospital and interviewed Mother, who stated she had not noticed anything abnormal when she changed the child's diaper at 5:00 a.m. that morning, but when she again changed the child's diaper at approximately noon, she noticed for the first time a large purple bruise on the right side of the child's genitalia. Sergeant Bailey—aided by the attending physician—examined the child and noted the aforementioned injury did not appear "fresh." Mother could not explain how the child had sustained the other bruises, but suggested a scrape on the child's right thigh was due to a tight car seat strap. Mother stated she had been the child's sole caretaker over the previous week.

---

[1] The court previously terminated the parental rights of the child's biological father, who is not a party to this appeal.

[2] We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010).

¶5          Later that day, the child was transported to Phoenix Children's Hospital, where she underwent a full skeletal survey, which showed she had a spiral fracture of the right shin bone and a bucket-handle fracture of the right leg bone near the ankle. Further imaging showed the child's throat had been punctured and was allowing air to leak into her surrounding neck or chest cavity.

¶6          Roger Blevins, a forensic nurse practitioner, examined the child and concluded she had "undergone extensive and intense physical abuse that easily could have been lethal." He opined that sexual abuse was a "consideration" because the child's "oral injuries [we]re highly characteristic of having something forcefully shoved in the mouth," such as a penis, which alone could have been fatal. He further opined that the bruises on the child's mons pubis were "very characteristic of fingertip grab marks," the hematoma on her labia was "obvious evidence of blunt force trauma," and the leg fractures were "highly associated with abusive injury." Blevins concluded that the child's injuries were the result of non-accidental trauma and emphasized "the importance of protecting [the child] from any potential perpetrators of this abuse" while the police and DCS investigated the matter. When the hospital discharged the child on March 12, DCS took temporary custody of her, placing her in foster care.

¶7          On March 13 and 14, Sergeant Bailey interviewed Mother, who gave conflicting stories and timelines regarding the days before she took the child to the hospital. Although Mother had initially reported she was the child's sole caregiver between March 7 and March 10, she later reported that she and her brother, Jaren, had taken the child to her friend Sandy's house on Sunday, March 8, and the child had spent the night with Sandy and her family. And although Mother reported that several family members had observed and asked Mother about bruises on the child's legs on Monday, March 9, Mother insisted she did not notice them until noon the next day, when they "just appeared." Mother further reported she had visited her friend, David Carrillo, Jr. ("David") several times over the weekend, but claimed she had visited him for only brief periods of time and never left the child alone with him because she was aware of his prior history of domestic violence and child abuse. Mother also denied she was in a relationship with David, insisting they were "just friends."

¶8          Jaren and Mother's father ("Grandfather"), with whom Mother lived, told Sergeant Bailey they believed Mother was lying about what had happened, ostensibly to protect the child's abuser. Grandfather advised the sergeant that Mother had texted Jaren and told him to lie to the police about her whereabouts on Sunday, March 8. Jaren advised the

sergeant he did not go with Mother to drop off the child at Sandy's house on March 8, and he did not know where Mother was that day. He did report, however, that he saw Mother and the child on Monday evening, March 9, and the child had a bruise on her forehead at that time. Sergeant Bailey also interviewed Sandy and her family, and they reported the child did not stay at their house on Sunday night. They further reported that Mother and the child had visited them at approximately noon on Tuesday, March 10, at which time Mother showed them the child's swollen purple genitalia; they advised Mother to take the child to the hospital, and after leaving the child with Sandy's family for approximately fifteen minutes to go to the store, Mother returned and left with the child.

¶9        On the night of Sunday, March 15, 2015, Mother called Sergeant Bailey and told him that she needed to tell him "the truth." They agreed to meet the next day, March 16, at the police station, where Mother admitted she had spent the weekend with her boyfriend David and had left the child alone in his care for eight to twelve hours on Saturday, March 7, and twelve to fifteen hours on Sunday, March 8. Mother also admitted that, although family members had pointed out bruises on the child on Monday, March 9, and she had sent David a text message asking why the child's face looked "beat up," she nonetheless took the child to David's house again late that night, stayed overnight with David, and again left the child in his care while she went to a convenience store that night. Mother further admitted asking Jaren to lie for her, but claimed she had done so at her aunt's suggestion and because she was afraid of David.

¶10       While the police were investigating the cause of the child's injuries, DCS prepared a dependency petition, which DCS filed on March 17, 2015, alleging the child was dependent as to Mother because Mother had abused and/or neglected the child and/or failed to protect her from physical and/or sexual abuse. At the March 24 initial dependency hearing, Mother denied the petition's allegations, but submitted the issue of dependency to the court, which adjudicated the child dependent and approved a case plan of family reunification concurrent with severance and adoption. To facilitate family reunification, DCS agreed to provide Mother with numerous services, including a mental health evaluation, drug testing, parent aide services, individual counseling, parenting classes, and supervised visitation.

¶11       In late March 2015, Mother was arrested and charged with child abuse and witness tampering. Following her release from jail and throughout the dependency, Mother participated in reunification services,

including a parent-child relationship assessment,[3] drug testing, a mental health intake assessment, individual counseling, parenting classes, parent aide services, supervised visits with the child, and a psychological evaluation.[4]

---

[3]    The therapist who conducted the parent-child relationship assessment, Jose Amparo, conducted five sessions of interviews, questionnaires/testing, and observations of Mother and the child in August and September before issuing his report on October 15, 2015. Amparo reported that Mother displayed a healthy bond toward the child and appeared attentive, affectionate, and nurturing toward her; however, Mother's test results were indicative of a parent whose expectations exceed the child's developmental capabilities, who lacks understanding of normal child growth and development, whose self-concept is weak and easily threatened, who tends to be demanding and controlling, who tends to use children to meet self needs, and who perceives children as objects for adult gratification. He further reported that the child displayed "an insecure attachment" and often appeared "avoidant" toward Mother, such that even when Mother attempted to engage her in conversation or play, the child would often look or walk away.

[4]    The report from Mother's psychological evaluation with Len Sarff, Ph.D., was issued December 3, 2015. Dr. Sarff diagnosed Mother with a generalized anxiety disorder, as well as narcissistic, dependent, and avoidant personality disorders, and opined that Mother's emotional functioning interfered with her ability to safely parent the child. He further opined that Mother likely experiences "periods of marked emotional, cognitive, or behavioral dysfunction," is "[u]nlikely to admit responsibility for personal or family difficulties," "may defensively deny the presence of psychological tension or conflicts," "may typically be unable to delay gratification and often acts on impulses," and uses "poor judgment." He therefore opined that a child in her care "would be at risk of abuse and/or neglect at this time." Dr. Sarff recommended that Mother participate in parenting classes, supervised visits, "a psychiatric evaluation to determine if psychopharmacology would be appropriate in helping her," and long-term therapy to address her personality disorders. He further recommended that Mother and the child participate in family therapy once Mother was psychologically stable and the child was older, unless DCS pursued a permanent case plan of severance and adoption. Even with the proposed services in place, however, Dr. Sarff opined that Mother's prognosis to safely parent the child in the foreseeable future was "poor."

**¶12**　　　　On December 4, 2015, DCS moved to terminate Mother's parental rights to the child on the sole ground of abuse or neglect. Mother denied the allegations, and the juvenile court set the matter for trial.

**¶13**　　　　At the contested severance hearing held March 29 and May 10, 2016, Mother admitted that she had provided "several different explanations" to the police and "made up stories" during the course of the investigation because, at first, she did not know what had happened to the child and "didn't believe that [David] did it." After she realized it "was all leading back to [David]," however, she nevertheless lied to protect him. Mother also changed her story regarding the timeline of the child's injuries yet again, testifying she left the child with David at approximately 8:00 a.m. on Monday, March 9, because she had to work, and returned to David's house around 4:00 a.m. on Tuesday, March 10. She testified she left the child with David because she trusted him and believed he was a person of "good character." Mother further testified she did not change the child's diaper Tuesday morning because the diaper was dry, and when she tried to feed the child at approximately 7:00 a.m., the child was "fussy" and refused the bottle, so Mother loaded the child in the car and went to visit Sandy. Mother testified she changed the child's diaper at Sandy's house at approximately 8:00 a.m., and only then saw the bruise on the child's genitalia. At approximately 8:30 a.m., Mother left to visit her friend Teresa, visited with Teresa for approximately five minutes, then immediately took the child to the hospital. Mother maintained she had not noticed any of the other bruises until hospital staff "pointed them out" to her.

**¶14**　　　　Sergeant Bailey testified that the child had noticeable bruising and/or abrasions on her face, abdomen, back, genitalia, and legs when he saw her in the hospital on March 10. He also provided a detailed account of his investigation, including his interviews of Mother, and he explained that "[h]er stories weren't adding up" and he believed she had been "attempting to cover up for someone," most likely David.

**¶15**　　　　After taking the matter under advisement, the juvenile court issued a detailed ruling, severing Mother's parental rights to the child on the ground of abuse or neglect, while finding in part as follows:

> The Court finds the mother's veracity to be highly questionable due to her admitted lies and inconsistent statements. After a thorough review of the evidence, the Court finds the mother cannot be excluded as a person who may have personally caused the heinous injuries that were perpetrated upon the child.

However, even if the mother did not personally cause any of the injuries to the child, the Court finds the mother knew, or should have known, [David] had a history of domestic violence, and child abuse, and that she intentionally placed the child in a dangerous situation by leaving the child in the care of [David].

The Court finds the mother's inability or unwillingness to provide the child with supervision, and/or timely medical care, caused an unreasonable risk of harm to the child.

The decision by the mother, to leave the child in the care of [David], was perilously close to ending in a homicide and the Court will not give the mother another opportunity to exercise her poor judgment with the child ever again.

The court also found that termination was in the child's best interest.

**¶16** Mother filed a timely notice of appeal. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") § 8-235(A) (2014) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

### I.  Standard of Review

**¶17** A parent possesses a fundamental liberty interest in the care, custody, and management of her child. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11, 995 P.2d 682, 684 (2000)). Even fundamental rights are not absolute, however. *Id.* (citing *Michael J.*, 196 Ariz. at 248, ¶ 12, 995 P.2d at 684). A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and finds by a preponderance of the evidence that severance is in the child's best interest. *See* A.R.S. §§ 8-533(B) (Supp. 2016), -537(B) (2014); *Kent K.*, 210 Ariz. at 281–82, 288, ¶¶ 7, 41, 110 P.3d at 1015–16, 1022.

**¶18** The juvenile court retains great discretion in weighing and balancing the interests of the child, parent, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160, 650 P.2d 459, 462 (1982). As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93,

¶ 18, 219 P.3d 296, 303 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4, 100 P.3d 943, 945 (App. 2004)). Thus, the resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12, 53 P.3d 203, 207 (App. 2002); *see also Pima Cty. Adoption of B-6355*, 118 Ariz. 111, 115, 575 P.2d 310, 314 (1978) ("In considering the evidence it is well settled that an appellate court will not substitute its own opinion for that of the trial court." (citation omitted)).

**¶19**       We will not disturb the juvenile court's order absent an abuse of discretion or unless no reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7, 225 P.3d at 606; *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004). In reviewing the court's decision to terminate parental rights, we review *de novo* questions of law and the court's legal determinations, including the application of a statute or rule. *See Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 210, ¶ 18, 181 P.3d 1126, 1131 (App. 2008); *Ariz. Dep't of Econ. Sec. v. Ciana H.*, 191 Ariz. 339, 341-42, 955 P.2d 977, 979-80 (App. 1998); *Maricopa Cty. Juv. Action No. JV-507879*, 181 Ariz. 246, 247, 889 P.2d 39, 40 (App. 1995).

**¶20**       Under A.R.S. § 8-533(B)(2), the juvenile court may terminate parental rights if:

> the parent has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child.

*II.       Evidence Supporting the Ground of Abuse or Neglect*

**¶21**       Mother argues the juvenile court erred in terminating her parental rights because "no evidence" supports the conclusion she abused the child or knew or should have known David was abusing her. Mother maintains that, although she may have exercised poor judgment, no evidence supports "that she turned a blind eye or otherwise permitted abuse to occur after she did become aware." Even assuming *arguendo* that Mother has not waived or rendered moot her argument as the State contends, Mother's argument fails because reasonable evidence supports the juvenile court's order terminating her parental rights to the child on the ground of abuse or neglect.

**¶22**       The record shows that sometime in the days before March 10, 2015, the child experienced significant, life-threatening injuries due to

extensive physical and possible sexual abuse. During that time, the child suffered bruising and/or abrasions to most of her body, significant oral trauma, blunt-force trauma to her genitalia, and right leg fractures.

¶23 Further, Mother either abused the child or failed to protect her from the abuse. Mother initially reported the child had been in her exclusive care in the week before March 10; however, Mother had no plausible explanation for how the child sustained such significant and severe injuries while in her sole care. Over the next several days, Mother's account and timeline of the child's injuries changed, and she later admitted leaving the child with David for a significant number of hours on March 7 and 8, despite knowing about David's history of domestic violence and child abuse. Mother nevertheless claimed, even at trial, that she had not noticed the child's bruises (except for the bruised genitalia) until hospital staff "pointed them out"; however, Mother's own statements contradict her claim. Mother admitted to the police that family members had pointed out bruises on the child on Monday, March 9, and she eventually acknowledged she texted David to ask why the child's face looked "beat up" that day. Further, Grandfather reported that, on March 9, he noticed the child was fussy, would not eat, and had a red mark on her mouth, and Jaren also reported observing a bruise on the child's head that night. Finally, at trial, Sergeant Bailey testified that the child's bruises were clearly noticeable, and Mother's assigned DCS caseworker, who observed the child shortly after she arrived at the hospital, testified the child "was bruised from head to toe" and had "obvious bruising" and/or abrasions on her head, ears, back, and thighs. The caseworker stated that it was one of the most "severe" physical abuse cases he had ever experienced as a caseworker, and noted that Mother did not provide "clear" or "appropriate" answers when asked about the possible source of the child's injuries.

¶24 Moreover, despite knowing that the child had been in David's care, the child had noticeable bruising, and David had an abusive history, Mother nonetheless took the child to David's house again Tuesday morning and left her in his care while Mother went to a convenience store. The DCS caseworker opined that the child remained at risk of future abuse if placed back in Mother's care because Mother did not show remorse for or appear to understand the severity of her decisions.

¶25 Accordingly, on this record, reasonable evidence supports the juvenile court's order terminating Mother's parental rights on the ground of abuse or neglect.

*III.   Due Process*

**¶26**       Mother states she was compliant with the case plan, and the court's decision to terminate her parental rights based on allegations or facts that "were available to the court at the initial appearance on the dependency petition" was "fundamentally unfair."   In effect, Mother appears to claim the juvenile court denied her due process by not moving straight to severance on the ground of abuse or neglect, and instead providing her the opportunity to participate in reunification services.

**¶27**       To satisfy due process, procedures employed in termination proceedings must be appropriate and fair.  *See Mara M. v. Ariz. Dep't of Econ. Sec.*, 201 Ariz. 503, 507, ¶ 24, 38 P.3d 41, 45 (App. 2002).  What constitutes due process is not fixed or categorical, *see Borchers v. Ariz. Bd. of Pardons & Paroles*, 174 Ariz. 463, 469, 851 P.2d 88, 94 (App. 1992); however, due process essentially requires reasonable notice and an opportunity to be heard, *see J.D.S. v. Franks*, 182 Ariz. 81, 95, 893 P.2d 732, 746 (1995), and generally includes the right to have counsel participate and cross-examine adverse witnesses, *see Ariz. State Dep't of Pub. Welfare v. Barlow*, 80 Ariz. 249, 252-53, 296 P.2d 298, 300 (1956); *Maricopa Cty. Juv. Action No. JS-7499*, 163 Ariz. 153, 158, 786 P.2d 1004, 1009 (App. 1989).

**¶28**       In this case, Mother received due process.  At the hearing on the motion for termination, Mother was represented by counsel, given an opportunity to cross-examine witnesses, and allowed to testify on her own behalf.  Additionally, DCS's December 2015 termination motion provided Mother with adequate notice of the reasons DCS was seeking termination. *See, e.g., Maricopa Cty. Juv. Action No. JS–501904*, 180 Ariz. 348, 355, 884 P.2d 234, 241 (App. 1994) (concluding an amendment to a petition asserting a new ground for termination satisfied due process).  The fact that DCS relied on many of the same facts alleged in its dependency petition—that is, the allegations that the child sustained serious injuries and that Mother provided inconsistent statements regarding how the injuries occurred and who was caring for the child—did not deny Mother due process; to the contrary, it arguably provided her with additional procedural protections because she was put on notice as early as March 2015 that DCS might move to sever her parental rights to the child on the ground of abuse or neglect.

**¶29**       Further, at the time of the initial dependency hearing, DCS and the police—hindered by Mother's misrepresentations and lack of candor—were still attempting to determine who had abused the child and the extent of Mother's role in the abuse.  And, although Mother allegedly told Sergeant Bailey "the truth" when she spoke with him on March 16, the

record does not indicate DCS was aware of her most recent admissions—specifically, that she had left the child with David, a person she knew to be a child abuser, for much of that weekend—when DCS developed its concurrent plans of family reunification and severance and adoption.[5]

¶30 Moreover, the reunification services were designed in part to help Mother "learn the importance of monitoring other individuals who have access to [her] child" and "ensure whoever has access to [the child] will provide [her] a safe and appropriate environment." Nonetheless, at trial, Mother continued to maintain David was a person of "good character," continued to fail to offer a plausible explanation for the cause of the child's injuries, and failed to acknowledge the severity of those injuries. And shortly before trial, Mother told her parent aide that if she had not taken the child to the hospital, she "would have been in Alabama," where she was planning to move, and "none of this would have happened"—a statement indicating a continuing lack of concern for the child's physical wellbeing. Mother's statements indicate a difficulty in grasping the goals of the reunification services. This concern and the evaluations submitted by Amparo—the therapist who conducted the parent-child relationship assessment—and Dr. Sarff were facts not available to DCS at the time of the initial dependency hearing.

¶31 Given the due process protections afforded Mother, we conclude the juvenile court did not deny Mother due process by severing her parental rights to the child on the ground of abuse or neglect.

*IV. Best Interest*

¶32 Mother also challenges the juvenile court's finding that severance was in the child's best interest.

¶33 To prove severance is in a child's best interest, DCS must show that severance either provides an affirmative benefit or eliminates potential harm to the child if the relationship between the parent and the

---

[5] Arguably, the fact that Mother was given the opportunity to participate in services while DCS and the police continued their investigations afforded Mother more due process protection than she was due. *See* A.R.S. § 8-846(D)(1)(d) (Supp. 2016) (providing that the juvenile court may relieve DCS of the obligation to provide reunification services if the court finds the parent caused, or knew or reasonably should have known that another person caused, the child to suffer serious physical injury).

child is allowed to continue. *Maricopa Cty. Juv. Action No. JS–500274*, 167 Ariz. 1, 6–7, 804 P.2d 730, 735–36 (1990); *Oscar O.*, 209 Ariz. at 334, ¶ 6, 100 P.3d at 945. The best interest requirement may be met if a current adoptive plan exists for the child or even if DCS can show that the child is adoptable. *JS–500274*, 167 Ariz. at 6, 804 P.2d at 735; *JS–501904*, 180 Ariz. at 352, 884 P.2d at 238. The juvenile court may also consider evidence that an existing placement is meeting the needs of the child in determining that severance is in a child's best interest. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998). Additionally, the court may take into account that, in most cases, "the presence of a statutory ground [for severance] will have a negative effect on the children." *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23, 312 P.3d 861, 866 (App. 2013) (quoting *Maricopa Cty. Juv. Action No. JS–6831*, 155 Ariz. 556, 559, 748 P.2d 785, 788 (App. 1988)).

**¶34**       Reasonable evidence in the record supports the juvenile court's finding that severance was in the best interest of the child. First, severing Mother's parental rights would affirmatively benefit the child. The child has been placed with a foster family that is meeting her needs—including social, developmental, medical, and dental—and has expressed an interest in caring for her permanently. The child is bonded to her foster parents and thriving in their care. Further, in addition to the foster family, DCS has located potential adoptive relatives in Alabama, California, and Colorado.

**¶35**       Second, the record indicates that leaving Mother's parental rights intact would be detrimental to the child. Mother's DCS caseworker opined that reunification with Mother was not in the child's best interest due to Mother's poor decision making and apparent inability to understand the severity of her decision to leave the child with an inappropriate caregiver. Furthermore, Dr. Sarff opined that Mother was "too volatile -- and emotionally [unstable] to be able to care for a child safely," and a child in her care would be at risk of abuse or neglect.

**¶36**       In this case, the reasonable evidence supporting the statutory grounds for severance also supports a finding that preserving Mother's parental rights could harm the child. The record demonstrates both the affirmative benefits to the child from severance and the elimination of potential harm that would exist if the parent-child relationship were not severed. *See JS–500274*, 167 Ariz. at 6, 804 P.2d at 735. Accordingly, the juvenile court did not err in finding that severing Mother's parental rights was in the child's best interest.

**CONCLUSION**

¶**37** The juvenile court's order terminating Mother's parental rights to the child is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA