NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MORGAN B., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, E.B., A.B., *Appellees*.

No. 1 CA-JV 19-0409
FILED 5-19-2020

Appeal from the Superior Court in Maricopa County
No. JD28612
The Honorable David O. Cunanan, Judge

**AFFIRMED**

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge David B. Gass joined.

---

**W I N T H R O P**, Judge:

¶1         Morgan B. ("Father") appeals the juvenile court's order terminating his rights to E.B., born April 28, 2005, and A.B., born June 7, 2006 (collectively, "the children"). Father does not challenge that the children have been in an out-of-home placement for fifteen months, but argues the juvenile court erred in finding the Department of Child Safety ("DCS") made reasonable and diligent efforts to provide appropriate reunification services. *See* Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c). For the following reasons, we affirm.

## FACTS[1] AND PROCEDURAL HISTORY

¶2         Father and Debra D. ("Mother")[2] are the biological parents of the children. In 2006, Father and Mother divorced. The family court awarded Mother sole custody of the children and granted Father parenting time every other weekend, on Saturday and Sunday from 8:00 AM until 3:30 PM. Father continued to have regular parenting time with the children until 2009 when Mother obtained an order of protection against Father, which was in place for one year. Thereafter, from 2009 to 2017, Father only saw the children one time, in 2012.

¶3         Near the time of Father's last visit with the children, the children began participating in behavioral-health services. Both children were diagnosed with attention-deficit-hyperactivity disorder and were prescribed medication to manage their aggressive and anxious behaviors. E.B. was also diagnosed with oppositional defiant disorder. In addition,

---

[1]     We review the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

[2]     Mother's parental rights were terminated in September 2019, and she is not a party to this appeal.

both children exhibited developmental delays and were placed on Individualized Education Programs. The children also began receiving counseling services that addressed, in part, their fear of Father.[3]

**¶4**        In June 2014, DCS initiated dependency proceedings for the children, alleging Mother was neglecting the children by subjecting them to unsanitary living conditions and by allowing them to be around her boyfriend, who was a registered sex offender. Father began participating in the dependency case in August 2014, when he attended a mediation and agreed to participate in services, including parent aide and supervised therapeutic visitation. In December 2014, however, the dependency was dismissed and the children were returned to Mother before DCS implemented any visitation services with Father.

**¶5**        In June 2015, Father petitioned the family court for a modification of his parenting time and child support. The family court ordered Father to participate in therapeutic intervention services to restore his parenting time with the children, but Father failed to follow through or contact the appointed therapeutic interventionist and so had no contact with the children.

**¶6**        In the following years, the children lived with Mother and her new husband, where they were exposed to domestic violence and substance abuse. During this time, the children's anxious and aggressive behaviors increased. In June 2017, the children, along with Mother and her husband, began living with Mother's parents ("Grandparents"). In August 2017, Mother moved out with her husband and left the children with Grandparents.

**¶7**        In November 2017, the juvenile court appointed Grandparents as the children's temporary guardians after Mother failed to maintain any contact with the children. While living with Grandparents, the children began making progress in their therapy sessions, their behaviors improved, and they were able to discontinue their medications.

---

[3]        E.B. told a counselor she would prefer to have no contact with Father. E.B. also said she did not like talking to Father on the phone and would hide under the table when she heard his voice.

¶8 In February 2018, Grandparents filed a private dependency petition,[4] alleging Mother and Father had abandoned the children based on neglect, failure to maintain normal parental relationships, and failure to provide support for the children. Soon after, DCS took temporary legal custody of the children, although the children remained in Grandparents' physical custody.

¶9 In May 2018, DCS located Father and personally served him with the dependency petition. In June, Father appeared at the continued initial dependency hearing, contested the allegations in the dependency petition, and requested visits with the children. At that point, Father had visited with the children only one time in the past nine years, in 2012. DCS opposed Father having visits with the children until the children's therapist found such visits appropriate. Accordingly, the court ordered DCS to provide a written explanation from the children's therapist about why visitation would be contrary to the children's welfare and to estimate how long it would be before the children would willingly participate in visits with Father.

¶10 When the children, now 12 and 13 years old, learned that Father wanted to meet with them, they refused. As their therapist began mentioning Father in counseling sessions, the children's aggressive and anxious behaviors increased. E.B. regressed to baby talk, thumb sucking, and did not want to sleep in her own room, and both of the children exhibited increased anger issues and became disengaged during therapy sessions.

¶11 A psychologist, Dr. Erin South, reviewed the children's counseling records and interviewed the children individually to understand their reluctance toward interacting with Father and to determine what could be done to facilitate contact between the children and Father. When Dr. South mentioned Father, E.B. stated, "If you try to make me go see my father that won't happen. He locked me up in a closet with clowns, he abused me, he threw me on the couch." E.B. also said she and A.B. had ended up with "a lot of bruises" from spending time at Father's house, that Father "lie[s] a lot," and that she is "scared to death of him." E.B. also stated, "I don't know him and I don't want to." When Dr. South suggested various types of visitation E.B. could have with Father, E.B.

---

[4] Grandparents' temporary guardianship was set to expire on April 9, 2018, and Mother had indicated she would not consent to further guardianship.

refused all contact, including supervised visits, phone calls, and letters. A.B. made similar statements to Dr. South, saying she and E.B. both "got hurt" when with Father, that Father had "locked [them] in a closet with Halloween clowns and turned them all on and scared us," and that Father had sprayed them with cold water and made them stay outside in the cold. A.B. affirmed she did not want any form of visitation or contact with Father and added that they had tried to have phone calls with him in the past, but Father never answered his phone. A.B. explained she would be "uncomfortable" being in the same room as Father and "would never see him. Never talk to him."

¶12 Dr. South also noted that both of the children referred to Father by his first name, Morgan. When asked about whether their grandmother or Mother ever talked badly about Father, both children stated they never brought up Father. Following the interviews, Dr. South recommended that both children "continue to have a choice in whether to attend visits or have contact with their father."

¶13 Meanwhile, DCS referred Father for parent-aide services and encouraged him to send the children letters, pictures, and gifts to help build a relationship with them. The children were found dependent as to Father in October 2018, at which time the court also ordered DCS to offer Father "therapeutic visits when recommended by the children's therapist." Father wrote three letters to the children, but received no response.[5] In November 2018, Father completed the parenting-skills portion of his parent-aide service, but the service was eventually "unsuccessfully closed out" because the children were unwilling to participate in visits with Father, meaning Father did not have the ability to demonstrate his parenting capabilities.

¶14 In the following months, Father stopped sending letters to the children because he "wasn't getting a response" and because he had heard it was upsetting the children. At the encouragement of the DCS case manager, Father sent a few more letters and some Christmas gifts to the children in March and April 2019.

¶15 As the topic of engaging with Father continued to be raised, the children's anxious and aggressive behaviors at home escalated,

---

[5] Although the children refused to read the letters, DCS provided the letters to the children's therapist so that the therapist could help the children review the letters. DCS also provided a copy of the letters to Grandparents to save for the children.

including the children experiencing night terrors and bed-wetting. The children's therapist also reported that anytime she tried to discuss Father with the children, they "shut down . . . emotionally." In addition, E.B. would start fidgeting and making noises to "distract from the question," while A.B. would "become quieter," "hide behind her hair," and try to leave the room.

**¶16** In May 2019, the juvenile court changed the case plan to severance and adoption,[6] and DCS moved to terminate Father's parental rights based on abandonment and fifteen-month out-of-home placement. The juvenile court held the severance hearing in November 2019. After considering the evidence presented, the court terminated Father's parental rights based on the fifteen-month out-of-home placement ground. *See* A.R.S. § 8-533(B)(8)(c).

**¶17** Father filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 8-235(A) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

**ANALYSIS**

*I.    Standard of Review*

**¶18** Parental rights may be severed if the court finds clear and convincing evidence of one of the statutory grounds for severance and finds, by a preponderance of the evidence, that severance is in the children's best interests. *See* A.R.S. §§ 8-533(B), -537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 281-82, 288, ¶¶ 7, 41 (2005).

**¶19** The juvenile court retains great discretion in weighing the interests of the child, parent, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160 (1982). As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004)). Resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002). We review the juvenile court's order severing a parent's rights for an abuse of

---

[6]    A.B.'s counseling records reflect that after she learned the case plan had been changed from family reunification to severance and adoption, her bed-wetting stopped.

discretion, and we will not disturb the juvenile court's order unless no reasonable evidence supports its factual findings. *E.R. v. Ariz. Dep't of Child Safety*, 237 Ariz. 56, 58, ¶ 9 (App. 2015); *Matthew L.*, 223 Ariz. at 549, ¶ 7.

## II. Reunification Services

**¶20**      On appeal, Father argues the juvenile court erred in finding DCS made reasonable and diligent efforts to provide him with reunification services because DCS did not provide any service to directly address why the children refused to have contact with him. Father concedes the children have been in an out-of-home placement for fifteen months or more.

**¶21**      Under A.R.S. § 8-533(B)(8)(c), the juvenile court may terminate parental rights if DCS has made a diligent effort to provide the parent reunification services, the child has been in an out-of-home placement for fifteen months or longer, "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future."

**¶22**      In making a "diligent effort" to provide services under A.R.S. § 8-533(B)(8), DCS is "not required to provide every conceivable service," but must present the parent "with the time and opportunity to participate in programs designed to help [the parent] become an effective parent." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). DCS is not required to take measures that are futile and need only "undertake measures with a reasonable prospect of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). In addition, though termination under A.R.S. § 8-533(B)(8)(a) requires "the parent has substantially neglected or wilfully refused to remedy the circumstances that cause the child to be in an out-of-home placement," the ground for termination in this case—subsection (c)—requires only that "the parent has been unable to remedy the circumstances," irrespective of the parent's participation in reunification services.

**¶23**      Here, Father argues the parent-aide services he was offered were inadequate because they did not address how he could rebuild his relationship with the children. Father claims he should have received services that would directly address his relationship with the children, such as individual or family counseling, parenting classes on dealing with a traumatized child, and forensic interviews of the children to determine the source of their traumas.

¶24        Reasonable evidence, however, supports the juvenile court's finding that DCS "made a diligent effort to provide appropriate reunification services based on the children's ability to process the trauma they experienced."    Father received parent-aide services, which he participated in to the extent he was able.  Father had the opportunity to communicate with the children through letters in order to rehabilitate his relationship with the children, but he only sent five or six letters in total.

¶25        The record also shows DCS made an effort to directly address why the children refused to have contact with Father.  Although forensic interviews were not conducted with the children because it was not recommended by their therapist, Dr. South interviewed the children to determine why they were resistant to communication with Father.  In addition, Dr. South testified that both of the therapists that had worked with the children over a protracted period of time had tried asking them about Father in order to work through any past traumas associated with Father.  A therapist also tried to review Father's letters with the children, despite the children's persistent resistance.

¶26        Father complains that the children's therapist focused mainly on the children's individual problems rather than addressing their relationship with Father.  But Dr. South testified that the therapy sessions the children received had been appropriate, and had to focus first on regulating the children's every-day problems and behaviors, because those problems needed to be addressed before the children would be able to process any trauma associated with Father.  She explained that the children would not likely be ready to process any trauma with Father while involved with DCS because the children lacked the feelings of permanency and safety needed to address deeper traumas.  In addition, Dr. South testified she could not think of any additional services that could have been offered to Father that would assist with reunification and did not think the children would be able to address their trauma any time in the foreseeable future.  On this record, the juvenile court did not abuse its discretion in finding DCS made reasonable and diligent efforts to provide Father with reunification services.

III.    *Children's Refusal to See Father*

¶27        Father also contends the juvenile court erred in terminating his parental rights under A.R.S. § 8-533(B)(8)(c) because the children's refusal to see him could not be the sole basis for finding there was a substantial likelihood that Father would not be capable of exercising proper and effective parental care in the near future.

¶28        In support of this argument, Father relies on *Desiree S. v. Ariz. Dep't of Child Safety*, which held that a child's "subjective belief, without more, cannot be the sole basis to determine as a matter of law" that the parent will be unable to parent the child in the near future, if parent has fully engaged in all services offered by DCS. 235 Ariz. 532, 534, ¶ 11 (App. 2014). In *Desiree S.*, DCS removed the child after the mother failed to protect the child from her abusive husband. *Id.* at 533, ¶ 3. The child subsequently refused to attend counseling with the mother, even though there was no evidence the child could not or should not participate. *Id.* at 534, ¶ 9 n.5. The child also stated he did not want to return to the mother because he believed she could not protect him. *Id.* at ¶ 10. However, the case manager testified that the mother had successfully completed all of the services offered and that there were no barriers for reunification with the mother. *Id.* at ¶ 9.

¶29        In contrast, here Dr. South testified the children were not ready to address their traumas associated with Father and would not likely be ready for a significant period of time. The case manager testified that, although family counseling was to be offered as soon as it was deemed clinically appropriate for the children, such counseling was never deemed appropriate. In addition, there is a clear record of the anxiety-induced behaviors the children experienced in response to discussions of Father, which supported the determination that the children were not ready to safely participate in counseling or visits with Father.

¶30        Moreover, the continuing lack of any normal parental relationship is not simply the result of the children's unilateral refusal to communicate with Father while in DCS care, but the result of Father's longstanding lack of participation in the children's lives for nearly ten years and the children's continuing fear of abuse by Father. Although Father asserted that he persistently tried to obtain visitation with the children over the years, the juvenile court explicitly found that the applicable family court record "undermines Father's testimony regarding his efforts to parent his children" and that even when Father was granted therapeutic visitation in 2015 he "failed to seek his visitation rights as ordered." Even after DCS became involved, Father wrote less than ten letters to the children and admitted that he stopped writing the letters at no one's request.

¶31        Accordingly, unlike *Desiree S.*, here it was not the children's subjective belief alone that presented a barrier to Father's ability to reunite with the children. Such determination was supported by the opinions of the case manager and mental health professionals, the children's extensive behavioral and mental health records, and by the longstanding record of

Father's lack of participation in the children's lives. On this record, the juvenile court did not abuse its discretion in finding there is a substantial likelihood Father would not be capable of exercising proper and effective parental care and control in the near future.

### IV.   Best Interests of the Children

**¶32**      Father does not challenge, and has therefore waived any argument regarding, the juvenile court's finding that severance was in the children's best interests. *See Crystal E. v. Ariz. Dep't of Child Safety*, 241 Ariz. 576, 577, ¶ 5 (App. 2017). Nevertheless, we note reasonable evidence supports the finding. *See generally Maricopa Cty. Juv. Action No. JS–500274*, 167 Ariz. 1, 5 (1990) ("[B]est interests of the child are a necessary, but not exclusively sufficient, condition for an order of termination."). Here, the juvenile court found the children are residing together in an adoptive placement with extended family members, which is meeting all of their needs. *See Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377-78, ¶¶ 5-6 (App. 1998) (recognizing maintaining sibling relationships as a factor supporting a best-interests finding). Moreover, the court found that termination of Father's rights would provide the children with the permanency and stability they need to process the trauma they have experienced and would further the case plan of adoption. *See Oscar O.*, 209 Ariz. at 334, ¶ 6. Accordingly, reasonable evidence in the record supports the court's finding that terminating Father's parental rights was in the children's best interests.

## CONCLUSION

**¶33**      For the foregoing reasons, we affirm the juvenile court's order terminating Father's parental rights to the children.

